

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed October 10, 2014**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 10-43400-DML-11** |
| **TEXAS RANGERS BASEBALL** | § | **(Chapter 11)** |
| **PARTNERS,** | § | |
| Debtor. | § | |

_____

| | | |
|---|---|---|
| **PARADIGM AIR CARRIERS, INC.,** *et al.*, | § | |
| Plaintiffs/Counter-Defendants, | § | |
| v. | § | **Adversary No. 11-04017-SGJ** |
| | § | |
| **TEXAS RANGERS BASEBALL** | § | |
| **PARTNERS,** | § | |
| Defendant/Counter-Plaintiff. | § | |

## MEMORANDUM OPINION AND ORDER GRANTING THE SECOND MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF-PARADIGM ON DEFENDANT'S FRAUDULENT TRANSFER COUNTERCLAIM

## I.    INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") has arisen in

the much-followed Chapter 11 bankruptcy case of the Texas Rangers Baseball Partners ("TRBP"

**MEMORANDUM OPINION AND ORDER**                                                          **PAGE 1**

or the "Former Debtor" or the "Defendant"), filed May 24, 2010.[1]  The Adversary Proceeding

involves a Boeing 757 aircraft that the Texas Rangers Baseball Club (the "Rangers") and the

Dallas Stars Hockey Club (the "Stars")—both formerly under common ownership—previously

used to fly their professional sports teams to out-of-town games.  In short, the entity that

purchased the Rangers during the Chapter 11 bankruptcy case, which was known as Rangers

Baseball Express LLC ("Baseball Express"), decided near the time of the bankruptcy court's

approval of its acquisition of the team, that it did not wish to utilize the Boeing 757 aircraft going

forward (*i.e.,* after the 2010 baseball season).  This decision apparently caught the lessor of the

aircraft, Paradigm Air Carriers and SportsJet Operators (collectively, "Paradigm" or the

"Plaintiff"), by complete surprise.  Paradigm thought, based on earlier communications and

agreements that TRBP asked Paradigm to bless, that the new owner of the Rangers would use the

aircraft for several years (specifically, through the year 2017 baseball season).  In fact, Paradigm

thought that certain agreements involving the aircraft would be assumed and assigned (in their

pre-bankruptcy versions) to the new owner as part of the bankruptcy case.[2]  After the dust

settled, so to speak (*i.e.,* after realizing, post-sale and post-plan confirmation, that the aircraft

agreements were not going to be honored by the new owner), Paradigm filed a $29.385 million

proof of claim in the TRBP bankruptcy case, for Paradigm's alleged damages, and also filed this

Adversary Proceeding—both of which have required this court to interpret certain pre- and post-

petition agreements involving (a) Paradigm, (b) TRBP, and (c) HSG Sports Group, LLC

---

[1] TRBP should probably more properly be referred to as the "Post-Effective Date Debtor" under the Fourth Amended Confirmed Plan (the "Confirmed Plan") in the above-referenced bankruptcy case.  Pursuant to the Confirmed Plan, all remaining officers of TRBP were terminated as of the Effective Date of the Plan, and Alan M. Jacobs, an independent third party, was appointed to serve as TRBP's Plan Administrator and Disbursing Agent.

[2] 11 U.S.C. § 365.

**MEMORANDUM OPINION AND ORDER**                                          **PAGE 2**

("HSG"), the latter of which is the former indirect (ultimate) owner of TRBP.[3]  In the Adversary

Proceeding, Paradigm has asserted multiple breach of contract claims against TRBP and also

seeks declaratory relief.

### A.   Earlier Motions for Summary Judgment and Rule 12(b)(6) Motion and the Court's July 2013 Memorandum Opinion

On July 10, 2013, this court issued a Memorandum Opinion and Order [DE # 190 in the

Adversary Proceeding] (the "July 2013 Memorandum Opinion") that narrowed the issues

slightly in this Adversary Proceeding.  The July 2013 Memorandum Opinion ruled on:  (a)

earlier cross motions for summary judgment filed by Plaintiff Paradigm and Defendant TRBP

(the "First Round of Motions for Summary Judgment"), pertaining to the breach of contract

claims asserted by Plaintiff Paradigm; and (b) a motion to dismiss (the "Rule 12(b)(6) Motion")

filed by Paradigm and HSG, pertaining to TRBP's fraudulent transfer claim asserted against

Paradigm (as a counterclaim) and HSG (as a third-party claim).

### 1.   The First Round of Motions for Summary Judgment

The First Round of Motions for Summary Judgment specifically concerned ***two breach of***

***contract claims*** (*i.e.,* counts 1 and 2) that were asserted in Paradigm's First Amended Complaint

[DE # 11] (the "First Amended Complaint") against TRBP.  Paradigm contended that the

Defendant, TRBP, breached contractual obligations under two separate agreements that

allegedly, collectively required TRBP to pay certain aircraft charter payments to Paradigm

***through the year 2017***: (1) a 2007 Aircraft Charter Agreement ("Agreement #1-the 2007 Charter

Agreement") ***between Paradigm and HSG***; and (2) a Shared Charter Services Agreement

---

[3] HSG is an entity affiliated with Mr. Tom Hicks.  As later explained, HSG, at one time, was a party in this Adversary Proceeding, as a result of TRBP filing a third-party complaint against HSG (and a related counterclaim against Paradigm) based on fraudulent transfer theories.  On January 14, 2014, HSG was dismissed by TRBP from the Adversary Proceeding, as a result of various out-of-court global settlements involving TRBP, HSG, and others, but the fraudulent transfer claim is still being pursued by TRBP against Paradigm and is the subject of Paradigm's Second Motion for Summary Judgment that is now before this court.

("Agreement #2-the SCSA") executed by and between **HSG and TRBP**, and expressly consented to by **Paradigm**, on May 23, 2010 (**which happened to be the night before TRBP filed for bankruptcy**). Whether or not TRBP had breached contractual obligations it may have owed to Paradigm under these two agreements turned not only upon the court's interpretation of these two agreements, but also on the validity of yet a third document: a First Amendment to the SCSA, dated August 12, 2010 ("Agreement #3-the Amendment to the SCSA"), executed by and between HSG and TRBP, without the consent of Paradigm—which third document purported to terminate, **at the close of the 2010 baseball season**, any obligation that TRBP might have had to pay aircraft charter payments to Paradigm through year 2017. Notably, the date of the execution of this third document (August 12, 2010) was one week **after** the bankruptcy court confirmed a plan of reorganization and sale of TRBP to the new owner, and was also the "Effective Date" of such confirmed plan.

### 2. Ruling on the First Round of Motions for Summary Judgment, in the July 2013 Memorandum Opinion

After considering the First Round of Motions for Summary Judgment, the court ultimately decided in its July 2013 Memorandum Opinion that: (a) while Paradigm did **not** have a viable breach of contract claim **against TRBP** as to Agreement #1-the 2007 Charter Agreement[4] (in other words, Paradigm was denied summary judgment on Count 1 and TRBP was granted summary judgment on Count 1), (b) Paradigm was, in fact, a **third-party beneficiary** of Agreement #2-the SCSA,[5] and that TRBP had breached its obligations under Agreement #2-the SCSA, to the detriment of Paradigm, as a result of executing Agreement #3-the Amendment to the SCSA without Paradigm's consent. As a result, the court held that Agreement #3-the

---

[4] This agreement was only between Paradigm and HSG.

[5] This agreement was between HSG and TRBP, but Paradigm was signatory on a consent to the agreement.

Amendment to the SCSA, was invalid. Moreover, TRBP had further breached its obligations under Agreement #2-the SCSA by not making the required payments to Paradigm since the fall of 2010. In other words, summary judgment was granted to Paradigm and denied to TRBP on Count 2. The court also held that further proceedings would be necessary to determine the potential amount of the allowable claim of Paradigm for TRBP's breach of Agreement #2-the SCSA.

### 3. The Rule 12(b)(6) Motion

Second, the July 2013 Memorandum Opinion addressed the Rule 12(b)(6) Motion— which specifically dealt with an Original Third Party Complaint Against HSG and Counterclaim Against Paradigm [DE # 151] (the "Avoidance Complaint" or the "Counterclaim") filed by TRBP within the Adversary Proceeding. To elaborate, TRBP separately filed within the Adversary Proceeding a third-party complaint against HSG (which has now been dismissed)[6] and a counterclaim against Paradigm, seeking to ***avoid as an actual fraudulent transfer*** Agreement #2-the SCSA (again, this was the agreement that obligated TRBP to pay aircraft charter payments to Paradigm through year 2017, and was ***executed the day before TRBP filed bankruptcy***). Specifically, TRBP argued that if Agreement #2-the SCSA was ruled valid and enforceable by Paradigm (as third-party beneficiary) and HSG (as counter-party)—and was deemed not amended by Agreement #3-the Amendment to SCSA—then TRBP should nevertheless be able to avoid Agreement #2-the SCSA as a fraudulent transfer, as it was entered into with actual intent to defraud, hinder or delay TRBP's creditors and might be avoidable under section 548(c) of the Bankruptcy Code. Paradigm and HSG, in their Rule 12(b)(6) Motion, sought to dismiss the Avoidance Complaint, pursuant to FED. R. CIV. P. 12(b)(6), as incorporated

---

[6] *See* footnote 3.

by FED. R. BANKR. P. 7012, on the grounds that: (a) TRBP lacked constitutional standing to pursue any type of avoidance action, since TRBP paid unsecured creditors in full under its confirmed chapter 11 plan, and there would be no benefit to the estate to permit avoidance of Agreement #2-the SCSA; and (b) TRBP's Counterclaim failed to adequately allege all of the elements required for a claim of "actual fraud" under 11 U.S.C. § 548(a)(1)(A) or to plead fraud with particularity as required under FED R. CIV. P. 9(b) as incorporated by FED. R. BANKR. P. 7009.

**4.      Ruling on the Rule 12(b)(6) Motion, in the July 2013 Memorandum Opinion**

The court ultimately denied Paradigm's and HSG's Rule 12(b)(6) Motion in its July 2013 Memorandum Opinion and held that TRBP had both constitutional standing and properly pled all the required elements of section 548(a)(1)(A) of the Bankruptcy Code. Accordingly, TRBP could go forward on the Avoidance Complaint/Counterclaim.

**B.      Paradigm's Second Motion for Summary Judgment Now Before the Court**

Paradigm has now, with court permission, filed a Second Motion for Summary Judgment, requesting summary judgment on TRBP's Counterclaim, which, if granted, would eliminate the Counterclaim and permit Paradigm to recover on its previously ruled upon breach of contract claim. In this Second Motion for Summary Judgment, Paradigm asserts that TRBP's Counterclaim fails as a matter of law because: (1) TRBP's Disclosure Statement did not properly preserve TRBP's standing and judicially estops it from pursuing any section 548 avoidance actions; (2) a post-confirmation, out-of-court global settlement among HSG, Tom Hicks, TRBP, and former lenders (the "HSG Settlement Agreement") eliminated TRBP's alleged standing and would cause any successful avoidance action to reward the very persons it is supposed to

punish;[7] (3) the Counterclaim is barred by Paradigm's status as a good-faith beneficiary under section 548(c) of the Bankruptcy Code; (4) TRBP is estopped from avoiding Agreement #2-the SCSA after ratifying it and accepting its benefits; (5) TRBP's unclean hands preclude it from seeking an avoidance of Agreement #2-the SCSA; and (6) TRBP's execution of the HSG Settlement Agreement released any avoidance action against Paradigm. With regard to Paradigm's Second Motion for Summary Judgment, the court refers to:

(1) Paradigm's Second Motion for Summary Judgment [DE # 239], Brief in Support [DE # 240], and Appendix [DE # 241] (collectively, "Paradigm's Second Motion for Summary Judgment");

(2) TRBP's Response in Opposition to Paradigm's Second Motion for Summary Judgment [DE # 250] Brief in Support [DE # 251], and Appendix [DE # 252] (collectively, the "Response"); and

(3) Paradigm's Reply Brief in Support of the Motion for Summary Judgment [DE # 255] (the "Reply").

For the reasons articulated below, the court is **GRANTING** Paradigm's Second Motion for Summary Judgment as to TRBP's Counterclaim.[8] As set forth below, the court believes that the Counterclaim is barred by equitable estoppel and other preclusion doctrines (such as the so-called "contract assumption defense" doctrine). As will be further explained herein, the court believes, based on the undisputed facts, that TRBP is precluded as a matter of law from pursuing the Counterclaim against Paradigm based on TRBP's: (a) circumvention of the requirements of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006 as to Agreement #2-the SCSA; and (b) failure to give proper notice to Paradigm of TRBP's intentions with regard to Agreement

---

[7] At oral argument on Paradigm's Second Motion for Summary Judgment held on May 13, 2014, counsel for Paradigm stated that based upon TRBP's Response to Paradigm's Second Motion for Summary Judgment, it would no longer go forward on the argument that the HSG Settlement Agreement and a related Amended Hicks Credit Agreement eliminated TRBP's alleged standing, as it believed there were legitimate questions of fact regarding this issue.

[8] This Memorandum Opinion and Order is prepared in accordance with FED. R. CIV. PRO. 56(a), as incorporated into bankruptcy adversary proceedings pursuant to FED. R. BANKR. PRO. 7056.

#2-the SCSA, which deprived Paradigm of its ability to take reasonable measures to protect itself in the bankruptcy case.

## II.    JURISDICTION

Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding, pursuant to 28 U.S.C. § 1334(b).  This bankruptcy court has authority to exercise bankruptcy subject matter jurisdiction pursuant to 28 U.S.C. § 157(a) & (c) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984.  This is a core proceeding in which this court has statutory authority to issue final judgments, pursuant to at least 28 U.S.C. § 157(b)(2)(B), (C) and (H).  The court notes that 28 U.S.C. § 157(b)(2)(C), stating that counterclaims of an estate against a claimant are "core" in nature, was declared unconstitutional by the Supreme Court in *Stern v. Marshall*, 131 S. Ct. 2594 (2011)—at least where said counterclaim is a free standing claim that would not necessarily be resolved in the claims allowance process.  Nevertheless, the court believes that it has Constitutional authority to issue final orders or judgments in this Adversary Proceeding as to the Counterclaim.  This is because, not only has Paradigm submitted a proof of claim and thereby subjected itself to preference-recovery and fraudulent-conveyance claims by TRBP,[9] but resolution of Paradigm's claims is inextricably intertwined with resolution of the Counterclaim, and *vice versa*.  The Supreme Court held in *Katchen v. Landy*, 382 U.S. 323, 329-36 (1966), and *Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990), that Article III authorizes bankruptcy judges to adjudicate avoidance actions against claimants.[10]  Moreover, the Supreme Court in *Stern v. Marshall* stated that its outcome is consistent with those decisions.[11]  However, in the event this

---

[9] *See* 11 U.S.C. § 502(d).

[10] *See also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 57–59 (1989).

[11] *Stern v. Marshall*, 131 S.Ct. 2594, 2616–18 (2011).

**MEMORANDUM OPINION AND ORDER**                                    **PAGE 8**

bankruptcy court is found to lack Constitutional authority to issue this Memorandum Opinion and Order, this court submits this as a ***proposed*** ruling to the District Court for *de novo* review and entry of judgment.[12]

Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as TRBP's chapter 11 case was filed in this district.

## III.    UNDISPUTED FACTS[13]

### A.    The Parties and Their Organizational Structure[14]

TRBP is (or was) a Texas general partnership.[15]  TRBP was the wholly-owned subsidiary of Rangers Equity Holdings, L.P. and Rangers Equity Holdings GP, LLC (collectively, the "Rangers Equity Entities"), which were holding companies that had no operating assets of their own who, in turn, were wholly-owned subsidiaries of HSG Sports Group LLC f/k/a Hicks Sports Group LLC f/k/a Southwest Sports Group LLC ("HSG").[16]  At all times relevant to this case, Thomas O. Hicks ("Hicks") was the predominant owner of HSG and he controlled it.[17]

Paradigm Air Carriers, Inc. d/b/a Paradigm Air Operators, Inc. ("PAC") is a corporation that at all times relevant to this case was wholly-owned by James R. Wikert ("Wikert").

---

[12] *See Exec. Benefits Ins. Agency v. Arkinson*, 134 S. Ct. 2165, 2173 (2014).

[13] The court will refer to: (1) Plaintiff's Appendix as "Plaintiff's App. at __"; and (2) Defendant's Appendix as "Defendant's App. at __".  Note, that in determining the merits of the Paradigm's Second Motion for Summary Judgment, the court also has discretion to take judicial notice of all documents filed with this court in the Adversary Proceeding and in the related bankruptcy case, *In re Texas Rangers Baseball Partners*, Case No. 10-43400-DML-11 (Chapter 11) (the "Bankruptcy Case").  *See Goldberg v. Craig (In re Hydro-Action, Inc.)*, 341 B.R. 186, 188 (Bankr. E.D. Tex. 2006) (citing Fed. R. Evid. 201(b), (f)).  References to "DE # __ in the Bankruptcy Case" herein refer to the docket entry number at which a pleading appears in the docket maintained by the Bankruptcy Court Clerk in the Bankruptcy Case.  References to "DE # __ in the Adversary Proceeding" herein refer to the docket entry number at which a pleading appears in the docket maintained by the Bankruptcy Court Clerk in the Adversary Proceeding.

[14] *See* Appendix A, attached hereto.

[15] Defendant's App. at 12 (Fischer Dec. ¶ 6).

[16] *Id.*

[17] *Id.*; *see also* Defendant's App. at 107 (Memorandum Opinion entered June 22, 2010, at p. 3).

SportsJet Air Operators, LLC ("SAO") is a wholly-owned subsidiary of PAC.[18] SAO and PAC will be collectively referred to herein as "Paradigm" and will be separately referred to only when necessary.

**B.** **Paradigm, TRBP, and the Dallas Stars Execute the Aircraft Charter Agreements in 2003.**

In 2003, Paradigm first began providing air charter services to the Rangers and the Stars, originally under separate written contracts with each team (the "2003 Agreements").[19] TRBP executed an agreement for the Rangers' charter services, and Dallas Stars, LP executed an agreement for the Stars' charter services.[20] The 2003 Agreements required Paradigm to fly the Rangers and Stars to away games in a Boeing 727.[21] Paradigm communicated with, invoiced, and was paid directly by TRBP and Dallas Stars, LP under those two separate agreements.[22]

**C.** **Agreement #1-the 2007 Aircraft Charter Agreement**

In 2007, a new arrangement was made. Specifically, in or around early 2007, Hicks and Wikert developed a plan to acquire a Boeing 757 Aircraft (the "Aircraft"), for the teams to use instead of the older Boeing 727, and to effectively finance the Aircraft acquisition utilizing the cash flow from a new long-term charter services agreement *with HSG*, that would replace the existing 2003 Agreements.[23] Specifically, Hicks and Wikert developed a plan to organize Southwest SportsJet, LLC ("SWSJ"), to use SWSJ to acquire the Aircraft, to finance the

---

[18] Texas Rangers Baseball Partners' Original Third-Party Complaint Against HSG Sports Group LLC and Counterclaim Against the Paradigm Parties [DE ## 151,153 in the Adversary Proceeding], ¶ 17; Plaintiffs' Original Answer to TRBP's Counterclaim [DE # 210 in the Adversary Proceeding] (the "Paradigm Answer"), ¶ 17.

[19] Plaintiff's App. at 3 (Declaration of Craig Ireland ("Ireland Dec.") ¶ 7); Plaintiff's App. at 163 (Declaration of James Wikert ("Wikert Dec.") ¶ 5).

[20] *Id.*; Plaintiff's App. at 16-47 (Ireland Dec., Exs. 1 and 2, 2003 Agreements); Plaintiff's App. at 170-201 (Wikert Dec., Exs. 1 and 2).

[21] Plaintiff's App. at 3 (Ireland Dec. ¶ 7); Plaintiff's App. at 163 (Wikert Dec. ¶ 5).

[22] Plaintiff's App. at 3 (Ireland Dec. ¶ 7).

[23] Defendant's App. at 131 (initial correspondence with Park Cities Bank).

acquisition with a loan from Park Cities Bank ("Park Cities"), to lease the Aircraft from SWSJ to PAC (which held the requisite FAA operating permit) through its wholly owned subsidiary, SAO,[24] and to then service the Park Cities' loan, required reserves, operational expenses, and profit margin utilizing cash flow generated from the new HSG charter services agreement.[25]

In February 2007, Wikert instructed Craig Ireland ("Ireland"), a long-term employee and officer of Paradigm,[26] to arrange for the organization of SWSJ, the entity to be used by Wikert and Hicks to own the Aircraft.[27] Wikert further instructed Ireland to contact Joe Armes ("Armes"), an employee of HSG Sports Group Holdings LLC f/k/a Hicks Sports Group Holdings LLC f/k/a Southwest Sports Group Holdings LLC ("Hicks Holdings") (the parent holding company of HSG), to determine how Hicks wanted to hold his 50% ownership interest in SWSJ.[28] Pending the finalization of details with Hicks, on or about February 9, 2007, SWSJ was organized and Wikert was issued 100% of the SWSJ membership interests in exchange for a capital contribution of $1,000.[29] Thereafter, on March 6, 2007, Ireland circulated to Casey Shilts ("Shilts"), a colleague of Armes' at Hicks Holdings and the Chief Operating Officer of HSG: (i) a copy of the organizational documents of SWSJ, (ii) a draft of the transfer instrument by which Wikert would transfer 50% of the SWSJ membership interests to Hicks or his designee, (iii) a draft of the lease between SWSJ and Paradigm, (iv) a draft of the charter services agreement between Paradigm and Hicks Holdings (which would later be revised to HSG), and (v) pro forma

---

[24] Plaintiff's App. at 162-63 (Wikert Dec. ¶ 3).

[25] Defendant's App. at 131-132 (initial correspondence with Park Cities Bank, 2/9/07 email between Wikert and Ireland).

[26] Plaintiff's App. at 1-2 (Ireland Dec. ¶ 2).

[27] Defendant's App. at 132 (2/9/07 email between Wikert and Ireland).

[28] *Id.*

[29] Defendant's App. at 133-46 (correspondence from Ireland with copy of SWSJ organizational documents).

financials detailing how the Park Cities' loan, Aircraft operating expenses, and partner profit would be serviced utilizing the cash flow from the newly formulated charter services agreement.[30] On the same date, Shilts reported to Ireland that Hicks would use Hicks SportsJet LLC ("Hicks SportsJet") to hold his 50% membership interest in SWSJ.[31]

On March 9, 2007, Ireland contacted Armes and Shilts to request Hicks' executed copies of the SWSJ transfer agreement and the SWSJ member consent authorizing SWSJ's obtaining of the $14.5 million loan from Park Cities to close on the Aircraft acquisition.[32] On the same date, Genee Darden ("Darden"), Armes' assistant, transmitted the executed SWSJ transfer agreement and executed SWSJ member consent to Ireland.[33] Thereafter, the SWSJ Bank loan closed[34] and SWSJ acquired the Aircraft.[35] On March 30, 2007, SWSJ and Paradigm (technically, SAO–the leasing arm of Paradigm) entered into the Aircraft Lease Agreement.[36]

This left only the new charter services agreement to be executed. However, prior to execution, Hicks wanted the assurance that any profit earned in excess of the profit modeled in the pro forma financials would be split between Wikert and Hicks (through Hicks SportsJet), the members of SWSJ.[37] Wikert confirmed that would be the case.[38] Consequently, Hicks gave the green light to proceed and on June 21, 2007, **_HSG and Paradigm_** entered into the 2007 Charter

---

[30] Defendant's App. at 147-166 (SWSJ organizational documents); Defendant's App. at 167-225 (drafts of agreements and pro forma financials).

[31] Defendant's App. at 226 (3/7/07 email from Shilts to Ireland).

[32] Defendant's App. at 227.

[33] Defendant's App. at 229-234.

[34] Defendant's App. at 235-239 ($14.5 million promissory made payable by SWSJ to Park Cities Bank); Defendant's App. at 240-262 (Loan and Security Agreement between SWSJ and Park Cities Bank).

[35] Defendant's App. at 263 (Aircraft Bill of Sale).

[36] Defendant's App. at 264-306 (Aircraft Lease Agreement).

[37] Defendant's App. at 324 (correspondence from Fischer to Ireland).

[38] Defendant's App. at 324 (correspondence between Ireland and Wikert).

**MEMORANDUM OPINION AND ORDER** **PAGE 12**

Agreement ("Agreement #1-the 2007 Charter Agreement").[39] In Agreement #1-the 2007 Charter Agreement, Paradigm agreed to fly both the Rangers and Stars to away games in the Aircraft through 2017.[40] The undisputed summary judgment evidence is that the execution of Agreement #1-the 2007 Charter Agreement did not materially change Paradigm's existing relationship with TRBP and Dallas Stars, LP.[41] In fact, TRBP and Dallas Stars, LP, at all times, dealt and coordinated directly with Paradigm, and Paradigm continued to send invoices directly to TRBP and Dallas Stars, LP for payment.[42] TRBP and Dallas Stars, LP continued paying Paradigm for charter services, although HSG would actually make the payments to Paradigm and receive reimbursements back from TRBP and Dallas Stars, L.P., pursuant to HSG's oral agreement with them.[43] Moreover, TRBP has acknowledged:

> . . . since the commencement of the term of the [Agreement #1-the 2007 Charter Agreement], the Rangers and Stars have had an oral agreement with HSG whereby each of the Rangers and Stars reimburse HSG for its proportionate share of the rent, operational expenses and all other costs and expenses of HSG under the [Agreement #1-the 2007 Charter Agreement] based on such party's use of the Charter Services.[44]

### D. The Execution of Agreement #2-the SCSA

Three years later, circumstances were different. TRBP was facing bankruptcy and separation from its ultimate parent/owner, HSG, was inevitable. However, as described above, HSG was the entity that had contractual rights to the Aircraft. By late 2009, TRBP had

---

[39] Plaintiff's App. at 3, 48-64 (Ireland Dec. ¶ 8, Ex. 3, Agreement #1-the 2007 Charter Agreement); Plaintiff's App. at 163, 202-218 (Wikert Dec. ¶ 6, Ex. 3).

[40] Plaintiff's App. at 3 (Ireland Dec. ¶ 8); Plaintiff's App. at 163-164 (Wikert Dec. ¶ 6).

[41] Plaintiff's App. at 4 (Ireland Dec. ¶ 9); Plaintiff's App. at 164 (Wikert Dec. ¶ 8).

[42] *Id.*; Plaintiff's App. at 271-272 (Dec. of Robert L. Sayles ("Sayles Dec."), Ex. 1, 3/8/10 emails between Murphy & Fischer).

[43] *Id.*

[44] Plaintiff's App. at 65 (Ireland Dec., Ex. 4, SCSA, p. 1); Plaintiff's App. at 219 (Wikert Dec., Ex. 4, SCSA, p. 1).

**MEMORANDUM OPINION AND ORDER**                    **PAGE 13**

expressed its intent to sell the Rangers. As a result, in late 2009 and early 2010, TRBP, Hicks, and TRBP's counsel began discussing how the Aircraft and Agreement #1-the 2007 Charter Agreement would be included in a sale of the team.[45] Shortly thereafter, on January 23, 2010, HSG, TRBP, Rangers Ballpark LLC, and Emerald Diamond, L.P., as sellers (the "Original HSG Sellers"), and Rangers Baseball Express ("Baseball Express"), as buyer, entered into an Asset Purchase Agreement (the "January APA").[46] Under the January APA, Baseball Express' post-closing access to aircraft charter services was a matter to be addressed by HSG, as the only counterparty to Paradigm under Agreement #1-the 2007 Charter Agreement. However, the matter evolved into an issue affecting TRBP; Baseball Express later proposed that HSG sublease its rights under Agreement #1-the 2007 Charter Agreement to TRBP for the 2010 season alone, with the sublease to then be a contract purchased by Baseball Express.[47] However, this apparently presented a problem for both HSG (due to the length of Agreement #1-the 2007 Charter Agreement's term, which was through 2017) and Hicks (in relation to his ownership interest in SWSJ via Hicks SportsJet).

In any event, on or before March 15, 2010, TRBP's counsel began circulating drafts of an agreement called "Non-Exclusive Aircraft Charter Agreement," that would document the oral agreement between TRBP and HSG regarding TRBP's reimbursement obligations to HSG.[48] On May 17, 2010, Nathan Christensen of Weil Gotshal & Manges LLP ("Weil Gotshal"), who represented TRBP, emailed a subsequent draft of this agreement, which was now being referred

---

[45] Plaintiff's App. at 272 (Sayles Dec., Ex. 2, 12/26/09 emails between Hicks Jr. and Hicks); Plaintiff's App. at 273-276 (Sayles Dec., Ex. 3, 12/30/09 emails between West and Oram regarding SCSA and Aircraft Agreements); Plaintiff's App. at 277-78 (Sayles Dec., Ex. 4, 1/6/10 emails between Oram and West regarding Paradigm's airplane).

[46] Defendant's App. at 21 (Fischer Dec. ¶ 30).

[47] Defendant's App. at 342-344 (third bullet point of attached outline of unresolved sale issues).

[48] Plaintiff's App. at 279-296 (Sayles Dec., Ex. 5, 3/15/10 email between Price Brown and Schulz attaching draft of Non-Exclusive Aircraft Charter Agreement).

to as the "Shared Charter Services Agreement," to a TRBP employee and explained that its

purpose was to "document the existing oral arrangement for the Rangers' use of the plane" and

"ensure that the Ranger's use of the plane will not be interrupted once we file."[49]  Moreover, on

May 7, 2010, Weil Gotshal (who, incidentally, was simultaneously serving as counsel for Hicks

and HSG, in addition to TRBP, in the proposed sale to Baseball Express) reported to those

involved in the potential bankruptcy sale to Baseball Express that the "Sellers" expected

Baseball Express to assume the portion of HSG's obligations under Agreement #1-the 2007

Charter Agreement covering the baseball seasons through 2017.[50]

On May 23, 2010, TRBP, as part of a proposed, so-called pre-packaged bankruptcy

reorganization plan, entered into an Asset Purchase Agreement (as amended from time to time,

the "APA")[51] with Baseball Express for TRBP's sale of the Rangers and related assets to

Baseball Express.[52]   In order to provide for the continuity of transportation for the Rangers in

connection with this contemplated sale, *HSG and TRBP* entered into Agreement #2-the SCSA,

dated as of May 23, 2010, pursuant to which *HSG contractually agreed to make available to*

*TRBP (and to Baseball Express or such other purchaser of the Rangers following TRBP's*

*sale of the Rangers) certain of its Aircraft charter services rights* under Agreement #1-the 2007

Charter Agreement.[53]

Prior to Agreement #2-the SCSA's execution, however, HSG and TRBP sought

Paradigm's written consent to the execution of Agreement #2-the SCSA, as expressly required

---

[49] Plaintiff's App. at 301-316 (Sayles Dec., Ex. 7, 5/17/10 email from Christensen to Fischer regarding draft SCSA).

[50] Defendant's App. at 342-344 (third bullet point of attached outline of unresolved sale issues).

[51] On that same date, the Original HSG Sellers and Baseball Express terminated the January APA. Plaintiff's App. at 330 (May APA, ¶ 13).

[52] Plaintiff's App. at 323-423 (Sayles Dec., Ex. 9, the May 23, 2010 APA).

[53] Plaintiff's App. at 219-246 (Wikert Dec., Ex. 4, the SCSA).

under Section 20 of Agreement #1-the 2007 Charter Agreement. Specifically, Section 20 of Agreement #1-the 2007 Charter Agreement provided:

> 20. <u>Successors and Assigns.</u> This Lease shall be binding upon the parties thereto, and their respective successors and assigns and shall inure to the benefit of the parties hereto and except as otherwise provided herein, to their respective successors and assigns. The parties agree that they shall not lease, assign, transfer, pledge or hypothecate this Lease, without the prior written consent of the other party. <u>It is further expressly understood by both Paradigm and Hicks that Hicks shall be fully obligated to continue its performance under the terms of this Lease should either or both the Texas Rangers MLB team ("Rangers") or Dallas Stars NHL team ("Stars") are [sic] sold to an outside third party.</u>[54]

To memorialize the "prior written consent" required by Section 20, TRBP's and HSG's counsel prepared a "Consent to Shared Charter Services Agreement" (the "Paradigm Consent") to evidence the consent of Paradigm to HSG's entry into Agreement #2-the SCSA with TRBP.[55] Prior to its execution, counsel for TRBP emailed Paradigm's president, Ireland, on May 20, 2010, drafts of Agreement #2-the SCSA and the Paradigm Consent.[56] Until receiving those drafts, Paradigm had never seen Agreement #2-the SCSA, did not know it was being negotiated and drafted during the previous two months, and did not know why it was being drafted.[57] Paradigm also had no prior knowledge of TRBP's plans to sell its assets to Baseball Express as part of a pre-packaged bankruptcy reorganization plan.[58] Ireland replied to the email from TRBP's and HSG's counsel by saying he would try to address his request, but could "not guarantee that any agreement will be executed prior to close of business, considering we've been

---

[54] Plaintiff's App. at 54 (Ireland Dec., Ex. 3, Agreement #1-the 2007 Charter Agreement).

[55] Plaintiff's App. at 297-300 (Sayles Dec., Ex. 6, Draft of Paradigm Consent).

[56] Plaintiff's App. at 4, 112-130 (Ireland Dec. ¶ 11, Ex. 6, 5/20/2010 email from Christensen to Ireland with attached drafts).

[57] Plaintiff's App. at 4-5 (Ireland Dec. ¶ 11); Plaintiff's App. at 164-165 (Wikert Dec. ¶ 10).

[58] *Id.*

given only three hours notice and our CEO [Wikert] is not in the office today."[59] TRBP's CFO, Kellie Fischer, then emailed Ireland to apologize for not contacting Paradigm personally and stated that "*I can assure you that this is not intended to change the economics to Paradigm, it just memorializes how Robert [Hutson, Dallas Stars L.P.'s CFO] and I separate the transaction and officially transfers the responsibly [sic] for the Rangers portion to the new ownership group*."[60] Thus, based on the emails Ireland received from TRBP and its counsel on May 20, 2010, and the provisions of Agreement #2-the SCSA themselves, TRBP's sole explanation to Paradigm regarding Agreement #2-the SCSA was that it was necessary to formalize or document TRBP's existing, oral contractual payment obligations, and to separate them so they could be assumed by the buyer of the Texas Rangers baseball team. This all made perfect and legitimate sense to Ireland.[61]

At 4:49 p.m. that same evening (May 20, 2010), Ireland emailed TRBP's counsel with several comments:

> We have the following comments:
>
> Consent to the Shared Charter Services Agreement
> Page 1: Aircraft is Boeing 757-236 (not-346 as written)
> Page 2: Truth in Leasing Compliance. Only the first sentence is applicable. Reference 91.23(b)(1)(ii) as we are "operating under part . . . of this chapter."
>
> Shared Charter Services Agreement
> Page 5: Term. We do not see how HSG would ever be fully released from all obligations and liabilities under the Aircraft Agreement, as the Aircraft Agreement is a full-year agreement, but an assignment to Baseball Express/New Owner would only effect ½ of the overall obligations and liabilities under the Aircraft Agreement.

---

[59] Plaintiff's App. at 8, 133-134 (Ireland Dec. ¶ 20, Ex. 8, 5/20/2010 email from Ireland to Christensen re: Consent to SCSA).

[60] Plaintiff's App. at 6, 131-132 (Ireland Dec. ¶ 16, Ex. 7, 5/20/2010 email from Fischer to Ireland re: Consent to SCSA) (emphasis is the court's).

[61] Plaintiff's App. at 7 (Ireland Dec. ¶ 17).

**MEMORANDUM OPINION AND ORDER** **PAGE 17**

Page 7:  Truth in Leasing Compliance.  See comments above regarding FAR 125 operations.  We would suggest adding "if required only" language.

It is our overall understanding that HSG remains fully liable for all existing obligations under the existing Aircraft Agreement [*i.e.,* Agreement #1-the 2007 Charter Agreement] through its respective termination unless otherwise released by Paradigm.[62]

The following morning (May 21, 2010), after expressing resistance to Paradigm's proposed revisions to ensure compliance with federal truth-in-leasing regulations, TRPB's counsel at Weil Gotshal asked, "Should we just do this without Paradigm's consent[?]"[63]  But Baseball Express' counsel at the law firm of Foley & Lardner insisted, "Paradigm's consent to this agreement is required per the underlying agreement between them and HSG," *i.e.*, Agreement #1-the 2007 Charter Agreement.[64]

Counsel for TRBP ultimately revised both the draft of Agreement #2-the SCSA and the draft of the Paradigm Consent to incorporate Ireland's comments.[65]  Specifically, in its final form, Section 5.1 of Agreement #2-the SCSA provided that

5.1 The term of this Agreement (the "Term") shall commence on the date listed hereof and shall terminate upon (a) if completed contemporaneously with or following the Rangers Baseball Express Sale (i) the assignment by HSG and assumption by Baseball Express (by its express written consent) of the Aircraft Agreement, provided that Paradigm has consented to such assignment and assumption, (ii) the execution of a new agreement between Baseball Express (or an affiliate thereof) and Paradigm to replace the Aircraft Agreement, provided that Paradigm has fully released HSG from all obligations and liabilities under the Aircraft Agreement, (b) by the termination of the Aircraft Agreement, or (c) termination of this Agreement by TRBP, at its sole option, by notice to HSG upon occurrence of an Event of Default (as defined in the Aircraft Agreement) by Paradigm under Section 8(a)(ii), (iii), (iv) or (v) of the Aircraft Agreement.[66]

_____

[62] Plaintiff's App. at 8-9, 135-136 (Ireland Dec. ¶ 21, Ex. 9, 5/20/10 email from Ireland to Christensen re: Consent to Agreement #2-the SCSA).

[63] Plaintiff's App. at 317-322 (Sayles Dec., Ex. 8, 5/21/10 email between West & Gehl regarding Paradigm's consent to Agreement #2-the SCSA).

[64] *Id.*

[65] Plaintiff's App. at 65-111 (Ireland Dec., Exs. 5 & 6, Agreement #2-the SCSA, the Paradigm Consent).

[66] Plaintiff's App. at 69 (Ireland Dec., Ex. 5, Agreement #2-the SCSA, § 5.1).

Notably, Section 5.1 contemplated that Agreement #2-the SCSA might terminate in various different ways (such as by an actual assignment to Baseball Express of the underlying Agreement #1-the 2007 Charter Agreement between Paradigm and HSG, or through a new agreement that might be reached between Baseball Express and Paradigm, or by virtue of a default by Paradigm under Agreement #1-the 2007 Charter Agreement), but in the absence of one of these circumstances, it was contemplated that Agreement #2-the SCSA would be co-extensive with the term of Agreement #1-the 2007 Charter Agreement (through year 2017).

There were several other key provisions of Agreement #2-the SCSA which outlined the parties' respective rights and obligations.  First, Agreement #2-the SCSA contained some specific covenants with respect to HSG's obligations under Agreement #1-the 2007 Charter Agreement, including Section 1.1, which provided that "HSG shall continue to perform its obligations and enforce its rights under the Aircraft Agreement to continue to obtain Charter Services from Paradigm for the benefit of the Rangers in accordance with the terms of the Aircraft Agreement" and "HSG shall use commercially reasonable efforts to cause Paradigm to take the following actions with respect to the insurance required to be provided by Paradigm pursuant to the Aircraft Agreement."[67]  Second, section 3 of Agreement #2-the SCSA provided that:

> 3.1  TRBP shall be responsible for all costs and expenses (including, but not limited to, rent) for which HSG is responsible under the Aircraft Agreement to the extent related to the Rangers' use of the Aircraft; provided that, TRBP will not be responsible for any of the costs and expenses that are attributable to the Stars' use of the Aircraft.

> 3.2  TRBP shall be responsible for paying directly to Paradigm rent in accordance with the schedule set forth in Exhibit D hereto ("Rent").  All payments of Rent shall be made at Paradigm's address as set forth on Exhibit C or at such place in

---

[67] Plaintiff's App. at 66 (Ireland Dec., Ex. 5, Agreement #1-the SCSA, §§ 1.1, 1.4).

the United States as Paradigm may designate through HSG in writing to the Rangers from time to time, or by wire transfer to Paradigm's designated account set forth in <u>Exhibit C</u>.[68]

Third, section 6.3 provided that:

6.3 <u>Entire Agreement.</u> This Agreement (including the Exhibits attached hereto) constitutes the entire agreement of the parties hereto in respect of the subject matter hereof, and supersedes all prior agreements or understandings between the parties hereto in respect of the subject matter hereof <u>and can be amended, supplemented or changed, and any provisions hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.</u>[69]

Additionally, the Paradigm Consent, in its final form, provided the following:

(a) Paradigm's Consent shall in no way release HSG from any of HSG's covenants, agreements, liabilities or duties under the Aircraft Charter Agreement and any amendments thereto, including the obligation to pay all Rent as and when the same becomes due and payable under the Aircraft Charter Agreement and for the performance of all obligations of HSG thereunder. HSG shall continue to be liable for the payment of all Rent due and payable under the Aircraft Charter Agreement and for the performance of all obligations of HSG thereunder. <u>This Consent does not (i) create any privity between Paradigm and TRBP or (ii) constitute an agreement or approval by Paradigm to any modification or amendment of the terms of the Aircraft Charter Agreement.</u> (b) <u>The Shared Charter Services Agreement is and shall be, in all respects, subject and subordinate to the Aircraft Charter Agreement.</u>[70]

Once satisfied with Agreement #2-the SCSA and the Paradigm Consent, Paradigm executed the Paradigm Consent on May 23, 2010, with HSG as the only other signatory.[71] After TRBP and HSG executed Agreement #2-the SCSA, TRBP began paying Paradigm directly for charter services rendered to the Rangers (specifically for June, July, August, September, and October 2010).[72]

---

[68] Plaintiff's App. at 68 & 91-92 (Ireland Dec., Ex. 5, Agreement #2-the SCSA, §§ 3.1, 3.2, Exhibit D).

[69] Plaintiff's App. at 70 (Ireland Dec., Ex. 5, Agreement #2-the SCSA, § 6.3) (emphasis added).

[70] Plaintiff's App. at 94 (Ireland Dec., Ex. 6, the Paradigm Consent) (emphasis added).

[71] Plaintiff's App. at 9, 93-111 (Ireland Dec. ¶ 23, Ex. 6, the Paradigm Consent).

[72] Plaintiff's App. at 11 (Ireland Dec. ¶ 28).

### E.   TRBP's Bankruptcy Case

#### 1.   TRBP's Pursuit of Approval of the APA in the Bankruptcy Case and Approval of the First Amended Disclosure Statement

The day after execution of Agreement #2-the SCSA and the Paradigm Consent (May 24, 2010), TRBP filed for Chapter 11 bankruptcy protection.[73]  On the same day, TRBP filed its originally-proposed "prepackaged" Chapter 11 plan.[74]  Based upon TRBP's argument that no claims were impaired under the plan, TRBP took the position that a disclosure statement was wholly unnecessary, as no votes would be solicited on the plan.[75]  Nevertheless, TRBP filed a proposed disclosure statement.[76]  During the first day of hearings in the bankruptcy case, which were not attended by any Paradigm representative, TRBP's and HSG's creditors vehemently opposed the pre-packaged plan and APA. Unbeknownst to Paradigm, Agreement #2-the SCSA was one of several transactions TRBP and Hicks (or Hicks-affiliated entities) completed shortly before TRBP filed bankruptcy.  Opponents of these transactions called them the "midnight transactions."

On June 15, 2010, the bankruptcy court conducted a hearing on various pre-confirmation issues, including questions of class impairment and voting under the plan and the level of notice required to be transmitted to creditors.[77]  In advance of the hearing, TRBP made certain revisions to the plan and disclosure statement in an effort to address certain of the complaints raised during the initial hearings in the case, which were described to the court at the hearing and incorporated

---

[73] *See* DE # 1 in the Bankruptcy Case.

[74] *See* DE # 31 in the Bankruptcy Case.

[75] Defendant's App. at 89-90 (Fischer Dec. ¶¶ 195-196).

[76] *See* DE # 34 in the Bankruptcy Case.

[77] Defendant's App. at 345-520 (6/15/2010 hearing transcript).

**MEMORANDUM OPINION AND ORDER**                                                    **PAGE 21**

into an amended plan (the "First Amended Plan")[78] and amended disclosure statement (the "Amended Disclosure Statement").[79]

Having considered the terms of the First Amended Plan, the court preliminarily ruled that all classes under the plan were unimpaired and did not have a right to vote, with the possible exception of the classes comprised of the lenders' claims and the equity interests of the Rangers Equity Entities.[80] Accordingly, while the Amended Disclosure Statement would need to be served on the lenders and the Rangers Equity Entities in connection with the solicitation of their votes on the First Amended Plan, the court indicated that TRBP was not required to serve the Amended Disclosure Statement on any of the creditors holding claims in any of the other classes, who could simply be provided notice of their classes' non-impairment and non-voting status under the First Amended Plan (the "Non-Voting Notice").[81] On June 21, 2010, the bankruptcy court entered an Order (I) Approving the Disclosure Statement, (II) Approving the Procedures to Solicit Acceptance of the Debtor's Prepackaged Plan (If Needed), Including Ballots and Notices Relating Thereto, (III) Scheduling a Confirmation Hearing, and (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtor's Prepackaged Plan (the "Order Approving the Disclosure Statement").[82] As reflected in TRBP's Amended Disclosure Statement, which was attached to the Order Approving Disclosure Statement, ***Agreement #2-the SCSA was an***

---

[78] *See* DE # 227 in the Bankruptcy Case.

[79] *See* DE # 226 in the Bankruptcy Case.

[80] Defendant's App. at 514-515 (6/15/2010 hearing transcript).

[81] *Id.*

[82] *See* DE # 254 in the Bankruptcy Case.

**MEMORANDUM OPINION AND ORDER**                                    **PAGE 22**

***agreement to be assumed and assigned to Baseball Express*** (or such other purchaser of the

Rangers) under the APA.[83]  Additionally, the Amended Disclosure Statement provided that:

> **5. Waiver of Avoidance Actions.**
>
> **To the extent not already otherwise waived pursuant to another order of the Bankruptcy Court, effective as of the Effective Date, the Debtor will be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable law that belong to the Debtor.[84]**

This was consistent with section 11.5 of the First Amended Plan which likewise provided that:

"effective as of the Effective Date, the Debtor shall be deemed to have waived the right to

prosecute, and to have settled and released for fair value, any avoidance or recovery actions

under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable

law that belong to the Debtor."[85]

On June 21, 2010, TRBP served the Amended Disclosure Statement on certain creditors

(not Paradigm) as a pre-condition to obtaining plan confirmation.[86]  However, Paradigm did

receive a "Notice of Non-Voting Status" from TRBP's counsel stating that:

> **UNDER THE TERMS OF THE PREPACKAGED PLAN, YOUR CLAIM(S) AGAINST THE DEBTOR IS/ARE NOT IMPAIRED . . . .[87]**

Paradigm also received a "Confirmation Hearing Notice" stating TRBP's belief "that the

Prepackaged Plan does not impair any claims," that all claims were "unimpaired," and that those

---

[83] *See also* DE ## 226-7 & 254-8 in the Bankruptcy Case (Exhibit 1.1(a)(i) to the APA, Non-Excluded Affiliate Contracts).

[84] *See* DE # 254-1 in the Bankruptcy Case, p. 54.

[85] *See* DE # 254-2 in the Bankruptcy Case, p. 32.

[86] *See* DE # 299 in the Bankruptcy Case (6/25/10 Affidavit of Mailing).

[87] *See* Plaintiff's App. at 430-435 (Sayles Dec., Ex. 13, 6/25/10 Affidavit of Mailing); Notice of Non-Voting Status to Unimpaired Classes at 1 (DE # 254-22 in the Bankruptcy Case) (emphasis in original).

**MEMORANDUM OPINION AND ORDER**          **PAGE 23**

claims would recover "100%."[88]  The Confirmation Hearing Notice also stated that the "HSG Assigned Contracts," which included Agreement #2-the SCSA, would "be assumed and assigned to the purchaser as of the [Plan's] Effective Date."[89]  This language was consistent with what TRBP had told Ireland about Agreement #2-the SCSA and with what he had read in Agreement #2-SCSA before consenting to it.  In any event, nowhere within the Notice of Non-Voting Status was there any mention of TRBP's proposed waiver of chapter 5 causes of action.[90]

### 2. The Auction and Confirmation

After the Amended Disclosure Statement was approved, circumstances in the case quickly changed.  First, an independent Chief Restructuring Officer ("CRO") for the Rangers Equity Entities was appointed when involuntary bankruptcy cases were subsequently commenced against the Rangers Equity Entities (the "Rangers Equity Case").  From that point in time forward, the CRO was involved in plan negotiations in the TRBP bankruptcy case.  Also, on June 25, 2010, TRBP filed its second amended plan (the "Second Amended Plan"), which continued to waive chapter 5 avoidance actions.[91]

Soon, due to various parties challenging certain terms of the pre-petition sale negotiated between TRBP and Baseball Express (including the so-called midnight transactions that occurred among TRBP and Hicks or Hicks-affiliates), the court ruled that an auction of TRBP's assets would be required, and the court entered an order approving bidding procedures for the auction (the "Bidding Procedures Order").[92]  Among other things, the Bidding Procedures Order provided for bids to be submitted consistent with the terms of the APA attached thereto, ***which***

---

[88] *See* Confirmation Hearing Notice (DE # 254-21).

[89] *Id.*

[90] Defendant's App. at 521-522 (Notice of Non-Voting Status).

[91] *See* DE # 277 in the Bankruptcy Case (§ 11.5, the Second Amended Plan).

[92] *See* DE # 363 in the Bankruptcy Case (7/15/10 Bidding Procedures Order).

*now included a four-page First Amendment to APA*, dated as of July 12, 2010 (the "First

Amendment to APA"), which—notably—conditioned the closing of the sale on, among other

things, *an amendment to Agreement #2-the SCSA to provide for its automatic termination*

*upon conclusion of the Rangers' 2010 MLB baseball season*.[93] Apparently, at some point in the

first six weeks of TRBP's bankruptcy, Baseball Express had decided it was not interested in

having access to the Aircraft long term (or renegotiated its assumption of Agreement #2-the

SCSA, as a term of the APA). Thus, TRBP knew as of July 12, 2010, that the winning bidder at

the auction, whether Baseball Express, or someone else, would purchase the Rangers through an

agreement that now contemplated termination of Agreement #2-the SCSA after the 2010 season.

*However, Paradigm did not receive notice of the Bid Procedures Order or the First*

*Amendment to the APA*.[94] In fact, Paradigm only received notice of an Order Resetting Hearing

on Confirmation of Debtor's Plan of Reorganization and Related Deadlines, which provided that

a hearing on confirmation of the Second Amended Plan was reset to August 4, 2010, as provided

in the Bid Procedures Order (which again, was not attached).[95] *To be clear, it is undisputed that*

*Paradigm was provided no notice that TRBP now intended to terminate Agreement #2-the*

*SCSA after the 2010 season*.

---

[93] Plaintiff's App. at 437-442 (Sayles Dec., Ex. 15, Bidding Procedures Order, First Amendment to APA) (emphasis added).

[94] Plaintiff's App. at 13, 152-61 (Ireland Dec. ¶ 33, August 13, 2010 email from Artz to Ireland); *see also* DE # 385 in the Bankruptcy Case (Certificate of Notice Related to the Bid Procedures Order) & DE # 430 in the Bankruptcy Case (Affidavit of Mailing as to the Bid Procedures Order) (emphasis added).

[95] *See* DE ## 388 & 436 in the Bankruptcy Case (Order Resetting Hearing on Confirmation of Debtor's Plan of Reorganization and Related Deadlines & Related Affidavit of Mailing).

On July 30, 2010, TRBP filed its third amended plan which, among other things, now suddenly deleted the provision for waiver of Chapter 5 causes of action. Pursuant to an Affidavit of Mailing filed on August 3, 2010, the third amended plan was not served on Paradigm.[96]

Interestingly, on the day before the auction, the Dallas Stars, L.P. CFO asked the TRBP CFO, "Has anything changed? Hearing that Paradigm is saying we are both staying," meaning Paradigm apparently believed it would continue leasing its charter services to the Stars and Rangers under Agreement #1-the 2007 Charter Agreement and Agreement #2-the SCSA.[97] TRBP's CFO replied, "Nothing has changed yet. We need to wait until after tomorrow for any certainty," which was contradictory to what was being stated in the First Amendment to the APA and the Bid Procedures Order.[98] The auction for the Rangers commenced on August 4, 2010, and concluded with Baseball Express emerging as the winning bidder. On August 5, 2010, TRBP filed its Fourth Amended Plan of Reorganization of Texas Rangers Baseball Partners Under Chapter 11 of the Bankruptcy Code (the "Plan").[99] Notably, the Plan (just like the third amended plan that was *not* served on Paradigm, but *unlike* the earlier Disclosure Statement that has been approved by the court) expressly provided for the retention of Chapter 5 causes of action in section 13.5.[100] Specifically, section 13.5 of the Plan provided that:

> Except as otherwise specifically provided herein or in the Asset Purchase Agreement, or in any contract, instrument, release or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, TRBP shall retain and may enforce, and sue on, all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person or entity,

---

[96] *See* DE # 509 in the Bankruptcy Case.

[97] Plaintiff's App. at 436 (Sayles Dec., Ex. 14, 8/3/10 emails between Hutson and Fischer regarding Paradigm).

[98] *Id.*

[99] Defendant's App. at 527-570 (the Plan).

[100] Defendant's App. at 560, 563 (the Plan, §§ 11.5, 13.5).

including but not limited to claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code and those claims or causes of action listed on Schedule 13.5 to the Plan. Upon consultation with the First Lien Administrative Agent, TRBP may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Post-Effective Date Debtor or as otherwise directed by the Bankruptcy Court. Claims, rights, causes of action, suits or proceedings retained under this Section 13.5 may only be settled or compromised with the consent of the First Lien Administrative Agent or the approval of the Bankruptcy Court. Notwithstanding anything contained in this Section 13.5, TRBP and its estate shall not retain any claims, rights or causes of action, suits and proceedings, whether in law or equity, whether known or unknown, (a) in respect of any payment made to or for the benefit of the holder of any Assumed General Unsecured Claim, including, without limitation, any such Claim held by a former or present employee or a former or present player of TRBP or the Texas Rangers Major League Baseball Club, or (b) against Kellie Fischer, Nolan Ryan or any rank and file employee of TRBP who shall become an officer or employee of the Purchaser upon the Effective Date.[101]

The so-called "Schedule 13.5" referenced at section 13.4 of the Plan (which was supposed to be a list of the Retained Causes of Action), was not attached to the Plan, but rather was left blank and stated "to be filed."[102]  TRBP and Baseball Express also executed on August 5, 2010, the "Second Amendment to Asset Purchase Agreement" (the "Second Amendment to APA").  The Second Amendment to APA further amended the APA, but did not substantively change the amendments requiring Agreement #2-the SCSA's termination after the 2010 baseball season or the manner in which TRBP would pay Paradigm the remaining monthly payments.[103]

On August 5, 2010, the bankruptcy court conducted a hearing to consider confirmation.[104]  Among the issues considered by the court was the impact of the plan modifications made, since the time of the filing of the First Amended Plan, including provisions relating to retained causes of action, and ***whether any further notice or solicitation was required***

---

[101] *Id.*

[102] *See* DE # 532 in the Bankruptcy Case, p. 44.

[103] Plaintiff's App. at 443-452 (Sayles Dec., Ex. 16, 8/5/10 Second Amendment to APA).

[104] Defendant's App. at 573-661 (8/5/2010 confirmation hearing transcript).

**MEMORANDUM OPINION AND ORDER**                                    **PAGE 27**

***due to the fact that the Amended Disclosure Statement that went out described a now-superseded (and somewhat different) First Amended Plan***.  Specifically, the court was unclear about how and when things had evolved—regarding retaining and not retaining causes of action—and who got notice when.  The excerpt below reflects that the representations made to the court on this topic were not exactly accurate:

> THE COURT: . . . Let me just make sure I'm 100 percent clear on the notice there has been and will be. The plan as it originally went out had the broad language of 13.5 preserving causes of action and claims in the estate.[105] And then now we have, as we earlier said, contemplated this rider that excludes out certain claims and causes of action that in fact will not be retained, the ones as to employees, players, assumed general unsecured claims, certain officers and directors. And then there will be the bolstering of 13.5 with this new Schedule 13.5. I'm just trying to make sure I'm clear, Mr. Sosland, on how the universe has changed from what went out to creditors to vote on.
>
> MR. SOSLAND: Well, I think –
>
> THE COURT: You started out retaining everything, right? Or no?
>
> MR. SOSLAND: I think, well, we retained everything, but retaining causes of action and actually bringing them are two completely different things.
>
> THE COURT: Right.
> . . .
> MR. SOSLAND: . . .  I think that the claims that are being retained generally that will include those on the Schedule 13.5 to be filed, that's -- those are the claims where creditors may in fact be contemplating that there will be, you know, additional sources of recovery, without prejudice to the rights of any -- to any defenses in that claim, but those are the claims that would have been contemplated to be pursued.
>
> THE COURT: Okay. Really, those claims, the ones on the schedule, is more what I was concerned about. Were there creditors who thought causes of action against them were not being retained and now they're going to show up on a Schedule 13.5 after the Court has approved the plan that went out for a vote? But that's not a possibility?
>
> MR. SOSLAND: Well, the Lenders, I think, in the first instance, are going to prepare the schedule. But backing up for a minute, part of your question was

---

[105] This statement of the court was incorrect.

"entitled to vote." Ultimately, Your Honor, the only -- all of the creditors were unimpaired --

THE COURT: That's right.

MR. SOSLAND: -- and the only party who voted on the plan was the Chief Restructuring Officer --

THE COURT: That's right.

MR. SOSLAND: -- on behalf of Equity.

THE COURT: That's right.

MR. SOSLAND: So to the extent you're referring to the case on --

THE COURT: Okay.

MR. SOSLAND: -- misleading creditors who vote, that's not really applicable in this case.

THE COURT: Okay. That's right. All right. Is there anyone else who wanted to be heard with regard to the 13.5 modifications?
(No response.) . . . [106]

To be clear, the part of this exchange that was not entirely accurate was the suggestion to the

court that the first drafts of the plan had language retaining/preserving causes of action and

claims against the estate. That was not the case at all—the first two drafts of the plan waived

them. Thus, not only had later drafts of the Plan (that were not served on Paradigm) suddenly

changed things (*i.e.*, causes of action would be ***preserved***), but the final Plan did not attach (prior

to confirmation) a Schedule 13.5 listing out more specifically what causes of action were being

retained. The focus at the confirmation hearing was a new rider that would exclude out certain

claims that could not be retained against certain parties including employees, players, and others.

That same day, the court entered its Order Confirming the Plan of Reorganization of Texas

---

[106] *Id.* at 635-639 (8/5/2010 confirmation hearing transcript).

**MEMORANDUM OPINION AND ORDER**                                        **PAGE 29**

Rangers Baseball Partners Under Chapter 11 of the Bankruptcy Code (the "Confirmation Order").[107]

On August 10, 2010, the Debtor *filed* a Notice of the Second Amendment to APA, which was previously executed on August 5, 2010. As stated above, the Second Amendment to APA, further amended the APA, but did not substantively change the amendments requiring the termination of Agreement #2-the SCSA after the 2010 baseball season or the manner in which TRBP would pay Paradigm the remaining monthly payments.

On August 12, 2010 (the "Effective Date"), TRBP's Fourth Amended Plan with Plan Supplement became effective (the "Confirmed Plan").[108] The Confirmed Plan, among other things, provided that "[o]n the Effective Date, the Asset Purchase Agreement[109] shall be consummated."[110] In connection therewith, the Confirmed Plan also provided for TRBP's assumption and assignment of executory contracts and unexpired leases associated with the sale:

> [A]s of the Effective Date, the Debtor [TRBP] shall be deemed to have assumed and assigned to the Purchaser [Baseball Express][111] each executory contract and unexpired lease to which it is a party, unless such contract or lease ... is an Excluded Contract.[112] The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease ... assumptions and assignments ... described above, as of the Effective Date.
> . . .
> Unless otherwise specified, each executory contract and unexpired lease shall include any and all modifications, amendments, supplements, restatements or

---

[107] Defendant's App. at 662-666 (Confirmation Order).

[108] Defendant's App. at 527-570 (the Confirmed Plan).

[109] The "Asset Purchase Agreement" is defined in the Plan as that certain Asset Purchase Agreement, dated as of May 23, 2010 and amended as of July 12, 2010, by and between TRBP and Baseball Express, as amended, restated, amended and restated or otherwise modified from time to time. *See* Defendant's App. at. 531-32 (Confirmed Plan, §§ 1.3 and 1.11).

[110] Defendant's App. at. 547 (Confirmed Plan, § 6.1(a)).

[111] "Purchaser" is defined in the Plan as Baseball Express. *See* Defendant's App. at. 532, 537 (Confirmed Plan, §§ 1.10 and 1.72).

[112] "Excluded Contract" is defined in the Plan as "those contracts defined as Excluded Contracts pursuant to Section 1.1 of the Asset Purchase Agreement." *See* Defendant's App. at 534 (Confirmed Plan, § 1.42).

**MEMORANDUM OPINION AND ORDER** **PAGE 30**

other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on such schedule.
. . .
Any counterparty that does not object to the … assumption and assignment of its executory contract or unexpired lease by the Debtor under the Plan, shall be deemed to have consented to such … assumption and assignment.[113]

***Agreement #2-the SCSA was one of the executory contracts subject to the foregoing provisions, and was not one of the "Excluded Contracts" excluded from assumption and assignment to Baseball Express.***[114]

### 3. The Post-Confirmation Execution of Agreement #3-the Amendment to the SCSA

Post-confirmation (***to be exact—7 days post-confirmation, on August 12, 2010, which was the Plan Effective Date***), HSG and TRBP entered into a First Amendment to Shared Charter Services Agreement ("Agreement #3-the Amendment to the SCSA").[115] Pursuant to Agreement #3-the Amendment to the SCSA, HSG limited its obligation to make Charter Services available to TRBP to the Rangers' 2010 MLB baseball season, and similarly TRBP's payment obligations were also limited. Specifically, and in pertinent part, section 1 of Agreement #3-the Amendment to the SCSA provided for the following:

1. *Amendments.* The Agreement [*i.e.,* Agreement #2-the SCSA] is hereby amended as follows. Notwithstanding anything in the Agreement [*i.e.,* Agreement #2-the SCSA] to the contrary, and in particular Sections 3.2 and 5.1 thereof, (1) the Agreement [*i.e.,* Agreement #2-the SCSA] shall terminate following the last game (and any return flight following such last game) of the Texas Rangers' 2010 MLB baseball season (including, if applicable, the final MLB post-season game in which the Texas Rangers participate in 2010), without premium or penalty payable by TRBP (or any successor or assign) and (2) only if each such payment becomes due prior to the termination of the Agreement [*i.e.,*

---

[113] Defendant's App. at 553-54 (Confirmed Plan, § 9.1(a),(d)).

[114] Plaintiff's App. at 334 (APA, § 1.1); *see also* DE ## 226-7 & 254-8 in the Bankruptcy Case (Exhibit 1.1(a)(i) to the APA, Non-Excluded Affiliate Contracts) (emphasis added).

[115] Plaintiff's App. at 141-144 (Ireland Dec., Ex. 12, Agreement #3-the Amendment to the SCSA).

the SCSA], TRBP (and not any successor or assign) shall make the following monthly lease payments required to be made by HSG pursuant to the [Aircraft Charter Agreement] directly to Paradigm Air Operators, Inc. (d/b/a SportsJet Air Operators, LLC) (without prorating any such payments) on the dates and in the amounts as follows: (x) the payment due September 1, 2010, in the amount of $635,000 for use of the aircraft in October 2010 (the "September Payment"), (y) the payment due October 1, 2010, in the amount of $615,000 for use of the aircraft in November 2010 (the "October Payment"), and (z) the payment due November 1, 2010, in the amount of $615,000 for use of the aircraft in December 2010 (the "December Payment"[6]). For the avoidance of doubt, TRBP, and not any successor or assignee of TRBP, shall continue to be responsible for the September Payment, October Payment and December Payment, notwithstanding any assignment by TRBP of the Agreement, as amended by this Amendment.[116]

Moreover, Agreement #3-the Amendment to the SCSA also provided that "except as set forth in this Amendment, the terms and conditions of the Agreement [*i.e.*, Agreement #2-the SCSA] shall remain in full force and effect."[117]

On the morning of August 12, 2010, Paradigm's President, Ireland, happened to realize that he did not have a fully executed copy of Agreement #2-the SCSA and emailed TRBP's counsel to request a digital executed version of Agreement #2-SCSA.[118] After close of business on August 12, 2010, TRBP's counsel emailed Ireland an executed copy of Agreement #2-the SCSA and Agreement #3-the Amendment to the SCSA.[119] The email told him, "please note that there was a subsequent amendment to [Agreement #2-the SCSA], which I have also attached."[120] Within minutes of receiving and reviewing Agreement #3-the Amendment to the SCSA, Ireland

---

[116] *Id.* at 141 (Agreement #3-the Amendment to the SCSA, § 1).

[117] *Id.* at 142 (Agreement #3-the Amendment to the SCSA, § 2).

[118] Plaintiff's App. at 11 (Ireland Dec. ¶ 29).

[119] Plaintiff's App. 11-12, 141-144 (Ireland Dec. ¶ 29, Ex. 12, Agreement #3-the Amendment to the SCSA). Ireland has asserted that he did not receive and had no knowledge of the provisions in the amendments to the APA, particularly those that were eventually incorporated into Agreement #3-the Amendment to the SCSA. In fact, he did not receive a draft of the First Amendment to the APA until August 13, 2010. Plaintiff's App. at 11-13, 152-161 (Ireland Dec. ¶¶ 29-33, Ex. 14, August 13, 2010 email from D. Artz [Redacted for Attorney-Client Privilege]).

[120] Plaintiff's App. at 12, 145-51 (Ireland Dec. ¶ 29, Ex. 13, August 12, 2010 email from Ireland and responses).

**MEMORANDUM OPINION AND ORDER**                    **PAGE 32**

informed TRBP's counsel that "Paradigm made no consent to any amendments to the existing agreement."[121]  In response, TRBP's counsel told Ireland that Agreement #3-the Amendment to the SCSA was "consistent with the bankruptcy court rulings," but would not identify which rulings he was referring to and would not explain why Agreement #3-the Amendment to the SCSA had been drafted and executed earlier that day without Paradigm's knowledge or consent.[122]  Subsequent to these communications, TRBP made payments under Agreement #2-the SCSA in September and October 2010.[123]

### 4. The Post-Confirmation Findings of Fact and Conclusions of Law

On August 23, 2010, the court entered detailed findings of fact and conclusions of law with respect to the Confirmation Order.[124]  The August 23, 2010 findings of fact and conclusions of law also attached, for the first time, the so-called Schedule 13.5 of the Plan (which was to be the list of "Retained Causes of Action") and provided that one of the Retained Causes of Action was:

> Causes of action relating to TRBP's entry into, transaction of and performance under certain transfers and transactions described as the Midnight Transfers or Eve of Filing Transactions (some of which are as detailed in the Joint Brief Regarding Certain Issues Related to Proposed Plan of Reorganization and Disclosure Statement, filed by the Lender Parties on June 11, 2010), including, but not limited to, constructive and intentional fraudulent transfer and breach of fiduciary duty.[125]

To be clear, Paradigm was not mentioned by name on Schedule 13.5.

---

[121] *Id.*

[122] *Id.*

[123] TRBP's October 2010 payment was for access to Charter Services through the end of November 2010. *See* Plaintiff's App. at 141 (Agreement #3-the Amendment to the SCSA, § 1).  The Rangers played their final game of the 2010 MLB baseball season on November 1, 2010 in Arlington, Texas.  Pursuant to the terms of the SCSA, as amended, the SCSA would have automatically terminated upon the conclusion of such game.  *Id.*

[124] Defendant's App. at 667-710 (Amended and Restated FOF and COL with Respect to Confirmation Order).

[125] *See* DE # 596 in the Bankruptcy Case.

**MEMORANDUM OPINION AND ORDER**                                    **PAGE 33**

On October 12, 2010, the court entered Amended and Restated Findings of Fact and Conclusions of Law with Respect to the Order Confirming the Plan of Reorganization of Texas Rangers Baseball Partners Under Chapter 11 of the Bankruptcy Code (the "Amended FOF and COL").[126] The Amended FOF and COL amended the Original Findings of Fact and Conclusions of Law, which were entered by the court on August 23, 2010.[127] The Amended FOF and COL provided that the "Asset Purchase Agreement[128] and all transactions, agreements, and documents related thereto are essential elements of the Plan and entry into and consummation of the Asset Purchase Agreement is in the best interest of the Debtor and its estate.[129] Moreover, the terms and conditions of the Asset Purchase Agreement and the transactions contemplated[130] thereby (including without limitation the consideration provided in respect thereof) are fair and reasonable and shall not be avoided or avoidable under the Bankruptcy Code and applicable law.[131] Additionally, the Amended FOF and COL provided that "the Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors of the Debtor under the Bankruptcy code . . . and neither the Debtor nor the Purchaser entered into the

---

[126] Defendant's App. at 667-710 (Amended and Restated FOF and COL with Respect to Confirmation Order).

[127] Defendant's App. at 668.

[128] All references made to the "Asset Purchase Agreement" in the Amended FOF and COL shall refer to the Asset Purchase Agreement as so amended. Defendant's App. at 676.

[129] *Id.*

[130] The APA executed on May 24, 2010, provided that Agreement #2-the SCSA "shall be deemed to amend and supersede in its entirety the oral lease agreement regarding TRBP's use solely in the Business of such aircraft under which HSG and TRBP have historically operated" and that Agreement #2-the SCSA governed the rights and obligations of TRBP regarding its use of the Aircraft. Plaintiff's App. at 342. Per the First Amendment to APA and the Second Amendment to APA, TRBP was required to continue making payments to Paradigm under Agreement #2-the SCSA through November 2010. Plaintiff's App at 437-438.

[131] Defendant's App. at 677.

**MEMORANDUM OPINION AND ORDER**            **PAGE 34**

transactions contemplated by the Asset Purchase Agreement fraudulently for the purpose of such statutory and common law fraudulent conveyance and fraudulent transfer claims."[132]

### F.    Paradigm's Proof of Claim and the Adversary Proceeding

After Paradigm received notice of Agreement #3-the Amendment to the SCSA, Paradigm retained litigation counsel, then searched for and retained bankruptcy counsel, and on August 23, 2010, timely filed Claim No. 57 (the "Proof of Claim") for TRBP's alleged contractual breaches under both Agreement #1-the 2007 Charter Agreement and Agreement #2-the SCSA.[133]  After conducting initial discovery on the Proof of Claim, Paradigm filed its Original Complaint against TRBP on February 2, 2011, initiating the Adversary Proceeding.  The Original Complaint incorporated the then-pending Proof of Claim and asserted state law causes of action for breach of contract and for a declaratory judgment.  The adjudication of the Proof of Claim was later consolidated into this Adversary Proceeding.[134]  On March 11, 2011, Paradigm filed its First Amended Complaint.[135]  On March 18, 2011, Paradigm and TRBP filed competing summary judgment motions.[136]

Within TRBP's 2011 summary judgment briefing, TRBP argued that it could have no contractual liability to Paradigm because "the SCSA, whether or not amended, had been assumed and assigned to [Baseball] Express."[137]  At an April 11, 2011 summary judgment hearing, Judge D. Michael Lynn, who originally presided over this Adversary Proceeding and the Bankruptcy

---

[132] *Id.*

[133] Plaintiff's App. at 14 (Ireland Dec. ¶ 34).

[134] *See* Agreed Order Granting Motion to Consolidate (DE # 58 in the Adversary Proceeding).

[135] *See* DE # 11 in the Adversary Proceeding.

[136] Specifically, TRBP filed a "Motion to Dismiss First Amended Complaint or, Alternatively, for Summary Judgment and Brief in Support" (DE ## 14 & 15 in the Adversary Proceeding), and Paradigm filed a Motion for Partial Summary Judgment and Brief in Support (DE ## 17 & 18 in the Adversary Proceeding).

[137] TRBP's Brief in Support of Motion to Dismiss First Amended Complaint or, Alternatively, For Summary Judgment (DE # 15 in the Adversary Proceeding).

Case, referenced this argument and asked TRBP's counsel whether TRBP intended to join Baseball Express as a necessary party. TRBP's counsel said TRBP had no intention to do so until after the dispositive motions were decided. [138] At the hearing, Judge Lynn dismissed Paradigm's Count Three (which was an alter ego claim) and took the remaining counts under advisement.

With the dispositive motions still pending, Judge Lynn sent the parties a letter on May 16, 2011, stating his belief that Baseball Express and HSG were "necessary parties that must be joined pursuant to FED. R. CIV. P. 19(b)(1)(B) and (2)."[139] Judge Lynn then requested that Paradigm, not TRBP, "act pursuant to Rule 19 to add as parties [Baseball] Express and [HSG]."[140] The letter was also sent to counsel for Baseball Express and HSG.[141]

On May 27, 2011, Paradigm sent a letter to Judge Lynn expressing its belief that neither Baseball Express nor HSG was a "Required Party" as defined in Rule 19, respectfully declining Judge Lynn's invitation that Paradigm sue those parties, and requested an opportunity to brief the issue.[142] On June 9, 2011, Judge Lynn, acting *sua sponte*, issued an Order Respecting Joinder, holding that "neither Plaintiff nor Defendant shall be required to implead [Baseball] Express or [HSG]" under Rule 19, but permitting Baseball Express and HSG to intervene under FED. R. CIV. P. 24 prior to July 1, 2011, "if either wishe[d] to protect its rights."[143] Judge Lynn's *sua sponte*

---

[138] *See* April 11, 2011 Hearing Transcript, at 29-32 (DE # 52 in the Adversary Proceeding) ("COURT: Do you think that it was your place to bring in Express if you think Express has whatever liability TRBP might have? MR. APPENZELLER: I do think that's something that, depending on the outcome of these motions, we're going to have to make a decision on.")

[139] *See* May 16, 2011 Letter from Court (DE # 46 in the Adversary Proceeding). This appears to be a typographical error since there is no Rule 19(b)(1)(B).

[140] *Id.*

[141] *Id.*

[142] *See* May 27, 2011, Letter from W. Snyder to Court (DE # 49 in the Adversary Proceeding).

[143] *See* June 9, 2011, Order Respecting Joinder (DE # 55 in the Adversary Proceeding).

order stated that the court had authority to permit Baseball Express and HSG, as non-debtors, to intervene and assert claims against non-debtor Paradigm "pursuant to 11 U.S.C. § 105(a)."[144]

On June 30, 2011, Baseball Express filed a Notice of Intervention and Brief Regarding the Aircraft Charter and Related Agreements.[145] Baseball Express' intervention resulted in a deluge of counter-claims, procedural motions, and multiple rounds of dispositive motions and delayed this proceeding for approximately one year. On May 12, 2012, following Judge Lynn's self-initiated recusal and a transfer of the Adversary Proceeding to this court, Baseball Express, TRBP and Paradigm were finally able to negotiate and submit a Stipulated Judgment Regarding Claims By and Against Rangers Baseball Express.[146] That stipulated judgment dismissed Baseball Express from this Adversary Proceeding and adjudicated that "that Baseball Express has not assumed any liability for rental obligations under the Aircraft Agreements and shall have no liability to TRBP in reference to the Aircraft and the Aircraft Agreements," which payment obligations are at issue here.[147]

On May 24, 2012, TRBP filed an Original Third-Party Complaint against HSG Sports Group LLC and Counterclaim against Paradigm (the "Avoidance Complaint" or the "Counterclaim").[148] This third-party complaint asserted, for the first time that, if Agreement #3-the Amendment to the SCSA was found not to be valid and enforceable (which this court found it was invalid and unenforceable—in its July 2013 Memorandum Opinion),[149] section

---

[144] *Id.*

[145] *See* DE # 70 in the Adversary Proceeding.

[146] *See* DE # 149 in the Adversary Proceeding.

[147] *Id.*

[148] *See* DE # 151 in the Adversary Proceeding. Note that this was the last possible date such an action could be timely filed, pursuant to section 546(a) of the Bankruptcy Code.

[149] As elaborated upon above, this court held in its July 2013 Memorandum Opinion that not only was Agreement #3-the Amendment to the SCSA not valid or enforceable, but that Paradigm was a third-party

**MEMORANDUM OPINION AND ORDER**          **PAGE 37**

548(a)(1)(A) of the Bankruptcy Code would allow TRBP to avoid, as an actual fraudulent transfer, its obligations created on the eve of bankruptcy, under the ***unamended*** Agreement #2-the SCSA. Paradigm filed a motion to dismiss the Counterclaim (joined in by HSG), and the court took that motion, as well as the pending cross-motions for summary judgment filed by TRBP and Paradigm under advisement. On July 10, 2013, this court issued the July 2013 Memorandum Opinion. As stated above, the July 2013 Memorandum Opinion held, with regard to the cross-motions for summary judgment, that, while Paradigm did ***not*** have a viable breach of contract claim against TRBP as to Agreement #1-the 2007 Charter Agreement, Paradigm was, in fact, a third-party beneficiary of Agreement #2-the SCSA, and that TRBP had breached its obligations owing to Paradigm under Agreement #2-the SCSA, as a result of executing Agreement #3-the Amendment to the SCSA without Paradigm's consent. The court further held that Agreement #3-the Amendment to the SCSA was invalid and that TRBP had further breached its obligations under Agreement #2-the SCSA, by not making the required payments to Paradigm since the fall of 2010. The court also held that further proceedings would be necessary to determine the potential amount of the allowable claim of Paradigm for TRBP's breach of Agreement #2-the SCSA. With regard to Paradigm's and HSG's Rule 12(b)(6) Motion (as to the Avoidance Complaint), the court's July 2013 Memorandum Opinion held that TRBP had both constitutional standing and had properly pled all the required elements of section 548(a)(1)(A) of the Bankruptcy Code and, thereby, permitted TRBP to go forward against Paradigm and HSG on the fraudulent transfer claims. On March 14, 2014, Paradigm's Second Motion for Summary Judgment was filed, requesting summary judgment on TRBP's Counterclaim, which, if granted,

---

beneficiary under Texas law of Agreement #2-the SCSA and could assert a breach of contract cause of action and damages associated with such breach.

would eliminate the Avoidance Complaint and permit Paradigm to recover on its breach of contract claim.[150]

### G. TRBP, the Plan Administrator, and First Lien Agent Sue Hicks and His Affiliates, Then Settle

In mid-August 2011, TRBP and the Plan Administrator sued Hicks and Ballpark Real Estate, L.P. in Dallas County. The same day, JP Morgan Chase Bank, N.A., in its capacity as the administrative agent ("First Lien Agent") for various lenders under a first lien credit agreement with HSG, as borrower, and with certain HSG affiliates, including TRBP and HSG Sports Group Holdings, LLC ("HSG Holdings"), as guarantors, filed suit in the bankruptcy court against Hicks, TRBP, and HSG Holdings. TRBP and HSG Holdings then successfully petitioned the district court to withdraw the reference and the lawsuit was removed.

Seventeen months later, on January 7, 2013, while this Adversary Proceeding was in full swing (pun intended) and the First Round of Motions for Summary Judgment were pending, HSG, Hicks, and TRBP's other indebted affiliates and parent companies (the "HSG Borrowers"), TRBP, the Plan Administrator, and the lenders to whom the HSG Borrowers were indebted (the "HSG Lenders") executed the HSG Settlement Agreement.[151] That agreement released all causes of action that TRBP had brought against HSG, Hicks, or any of their "direct and indirect parents, subsidiaries, affiliates, … that "ar[ose] out of . . . or related in any manner whatsoever to the . . . Bankruptcy Case [*i.e.*, the case initiated by TRBP's May 24, 2010 Chapter 11 filing] or Hicks' ownership (either directly or indirectly) of HSG . . . or TRBP."[152] On January 17, 2014,

---

[150] *See* DE # 239 in the Adversary Proceeding.

[151] Plaintiff's App. at 453-891 (Sayles Dec., Ex. 17, 1/7/13 Settlement Agreement between TRBP, the Plan Administrator, the HSG Lender Group Agent, Tom Hicks, BRE, HSG Holdings, and HSG (the "HSG Settlement Agreement")).

[152] Plaintiff's App. at 462 (the HSG Settlement Agreement, ¶ C(1)).

HSG was dismissed from the Adversary Proceeding.[153]  Thus, only Paradigm remains as a

defendant (*i.e.,* counter-defendant) as to the Avoidance Complaint.

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate whenever a movant establishes that the pleadings,

affidavits, and other evidence available to the court demonstrate that no genuine issue of material

fact exists, and the movant is, thus, entitled to judgment as a matter of law.[154]  A genuine issue of

material fact is present when the evidence is such that a reasonable fact finder could return a

verdict for the non-movant.[155]  Material issues are those that could affect the outcome of the

action.[156]  The court must view all evidence in a light most favorable to the non-moving party.[157]

Factual controversies must be resolved in favor of the non-movant, "but only when there is an

actual controversy, that is, when both parties have submitted evidence of contradictory facts."[158]

If the movant satisfies its burden, the non-movant must then come forward with specific

evidence to show that there is a genuine issue of fact.[159]  The non-movant may not merely rely

on conclusory allegations or the pleadings.[160]  Rather, it must demonstrate specific facts

identifying a genuine issue to be tried in order to avoid summary judgment.[161]  Thus, summary

---

[153] *See* DE # 233 in the Adversary Proceeding.

[154] FED. R. CIV. P. 56(a); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006); *Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D. Tex. 2004).

[155] *Piazza's Seafood World, LLC*, 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[156] *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).

[157] *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F. Supp. 2d at 891.

[158] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[159] *Lockett*, 337 F. Supp. 2d at 891; *see also Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993).

[160] *Lockett*, 337 F. Supp. 2d at 891.

[161] FED. R. CIV. P. 56(c)(1); *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F. Supp. 2d at 891.

judgment is proper if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[162]

## V.    ANALYSIS

As stated above, TRBP has filed the Avoidance Complaint/Counterclaim in order to avoid Agreement #2-the SCSA, as an actual fraudulent transfer, pursuant to section 548(a)(1)(A) of the Bankruptcy Code.  Specifically, TRBP has requested that the court ***avoid*** Agreement #2-the SCSA as an "obligation . . . incurred by the debtor . . . within 2 years before the date of the filing of the petition" that was incurred "with actual intent to hinder, delay, or defraud" TRBP's lenders.[163]  Section 548(a)(1)(A) of the Bankruptcy Code requires TRBP to plead and prove in this context: (1) an obligation, (2) incurred by TRBP within two years of the filing of the petition, that was (3) either voluntary or involuntary, and (4) TRBP incurred such obligation with the actual intent to hinder delay or defraud any entity to which TRBP was or became, on or after such obligation was incurred, indebted.[164]  Here, the Avoidance Action/Counterclaim alleges, in relevant part:

On the date of the execution of the Shared Charter Services Agreement [Agreement #2-the SCSA], TRBP, as a guarantor of Obligations under the Credit Agreements, was indebted to the Lenders in the amount of at least $75 million.

TRBP entered into the Shared Charter Services Agreement [Agreement #2-the SCSA] with HSG for the purpose of, among other things, hindering and delaying the Lenders.  In particular, because the Lenders had refused to approve the sale to Baseball Express as originally structured, TRBP and HSG sought to frustrate the Lenders' approval rights under the Credit Agreements by orchestrating the "eve of bankruptcy" transactions, including the Shared Charter Services Agreement [Agreement #2-the SCSA], and by then seeking to consummate the sale through

---

[162] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[163] *See* 11 U.S.C. § 548(a)(1)(A) (emphasis added).

[164] 11 U.S.C. § 548(a)(1)(A); *U.S. Bank, NA v. Verizon Commc'ns., Inc.*, 817 F. Supp. 2d. 934, 940 (N.D. Tex. 2011) (noting that "[t]o state a claim for actual fraudulent transfer under the [Texas Business & Commerce Code] and the Bankruptcy Code, a creditor must allege that a debtor made a transfer or incurred an obligation 'with actual intent to hinder, delay, or defraud' any creditor of the debtor.").

**MEMORANDUM OPINION AND ORDER**                                         **PAGE 41**

TRBP's Bankruptcy Case without the approval of the Lenders based upon the payment limitation benefits of TRBP's Guaranty Cap. Moreover, TRBP's execution of the Shared Charter Services Agreement [Agreement #2-the SCSA] was wholly unnecessary to the Baseball Express sale. HSG could have just as easily, and more appropriately, directly entered into the Shared Charter Services Agreement [Agreement #2-the SCSA] with Baseball Express without any involvement by TRBP. By entering into the Shared Charter Services Agreement [Agreement #2-the SCSA] instead, TRBP and HSG sought to effectively elevate the payment priority of HSG's obligations under the Paradigm-HSG Charter Agreement [Agreement #1-the 2007 Charter Agreement] over the payment priority that the Lenders have in the absence of such agreement by virtue of their liens under the Security Agreements. Finally, as a result of TRBP's entry into the Shared Charter Services Agreement [Agreement #2-the SCSA], TRBP has been embroiled in litigation that would have been wholly-unnecessary in the absence of such agreement, and such litigation has further hindered and delayed the Lenders' collection efforts.

Additionally, by entering into the Shared Charter Services Agreement [Agreement #2-the SCSA], at a time when both TRBP and HSG were under the control of Hicks, TRBP and HSG intended to defraud the Lenders. Such indicia of fraud includes, without limitation:

• The fact that the obligations incurred by TRBP were for the benefit of HSG and Hicks, both insiders of TRBP at the time of the transaction;

• The fact that TRBP and HSG shared the same officers at the time of the execution of the Shared Charter Services Agreement [Agreement #2-the SCSA], and no arms-length negotiations (if any negotiations at all) took place between TRBP and HSG with respect to the terms of the Shared Charter Services Agreement [Agreement #2-the SCSA];

• The fact that the terms of Paradigm-HSG Charter Agreement [Agreement #1-the 2007 Charter Agreement] were above market and, notwithstanding same and the fact that Baseball Express was agreeable to the assumption of a short-term sublease between HSG and TRBP, the above-market terms for the full term of the Paradigm-HSG Charter Agreement [Agreement #1-the 2007 Charter Agreement] were effectively passed along to TRBP under the terms of the Shared Charter Services Agreement [Agreement #2-the SCSA];

• The fact that the prior agreement between HSG and TRBP for TRBP's access to air charter services, to the extent contemplated as a multi-year agreement, was unenforceable as a matter of law, and it was unnecessary for TRBP to enter into a direct agreement with HSG in connection with the Baseball Express sale (inasmuch as HSG could have contracted directly with Baseball Express);

• The fact that HSG was insolvent at the time of the transaction and, having control of TRBP as its indirect parent and by virtue of overlapping officers, including Hicks, had the incentive to limit its liabilities by effectively imposing its long-term above-market obligations on TRBP so that such obligations would be satisfied through the Baseball Express sale or, alternatively, from proceeds of the sale;

• The fact that the transaction took place on the eve of TRBP's bankruptcy filing, after the Lenders had accelerated the indebtedness owed under the Credit Agreements, and after HSG had failed to obtain the requisite level of Lender approval to enable consummation of the previously-structured sale (which did not include the Shared Charter Services Agreement [Agreement #2-the SCSA]); and

• The fact that Hicks stood to indirectly benefit from the transaction as a direct or indirect owner of SW SportsJet, the owner of the Aircraft and counterparty to the Paradigm-SW SportsJet Lease with Paradigm.[165]

In its July 2013 Memorandum Opinion, the court found that TRBP had sufficiently pled all the required elements of section 548(a)(1)(A) of the Bankruptcy Code. Now, Paradigm has moved for summary judgment on the Avoidance Complaint/Counterclaim, but, unlike the arguments asserted in its previous Rule 12(b)(6) Motion, Paradigm is now focusing on certain defenses it has with regard to the Counterclaim, rather than on whether TRBP has pled the required elements of a fraudulent transfer under section 548 of the Bankruptcy Code. Specifically, Paradigm has argued that the Counterclaim fails as a matter of law because: (1) TRBP's Amended Disclosure Statement failed to preserve TRBP's standing and judicially estops it from pursuing any section 548 avoidance actions; (2) the Counterclaim is barred by Paradigm's status as a good-faith beneficiary under section 548(c) of the Bankruptcy Code; (3) TRBP is estopped from avoiding Agreement #2-the SCSA, after ratifying it and accepting its benefits; (4) TRBP's unclean hands preclude it from seeking an avoidance of Agreement #2-the SCSA; and (5)

---

[165] The Counterclaim at 14-16, ¶¶ 41-42.

**MEMORANDUM OPINION AND ORDER**        **PAGE 43**

TRBP's execution of the HSG Settlement Agreement released any avoidance action against not just HSG, but also Paradigm. [166]

First as to items (2), (3), and (4) (and as explained in more detail below), the court believes that Paradigm's arguments do not present meritorious defenses to TRBP's Counterclaim, as a matter of law, and that Paradigm's request for summary judgment as to these three points should be denied. Second, with regard to Paradigm's argument as to item (5), while the court finds that such defense could potentially serve to defeat the Counterclaim at a future trial, there are still certain disputed issues of fact that exist with regard to the actual release in the HSG Settlement Agreement (including, potentially, TRBP's intent behind such release), and, thus, summary judgment would not be appropriate on this defense. Finally, with regard to Paradigm's standing and judicial estoppel argument which is described in item (1), the court finds that standing defects and judicial estoppel do not apply in this case and would not defeat the Counterclaim; however, the court does find that related estoppel theories—most particularly, equitable estoppel and the contract assumption defense, do bar TRBP from asserting the Counterclaim.

---

[166] Paradigm also asserted another reason for denying TRBP's fraudulent transfer claim: "the HSG Settlement Agreement and Amended Hicks Credit Agreement eliminated TRBP's alleged standing and would cause any successful avoidance action to reward the very persons it is supposed to punish." At oral argument on Paradigm's Second Motion for Summary Judgment on May 13, 2014, counsel for Paradigm stated that based upon the Response, it would no longer go forward on the argument that the HSG Settlement Agreement and Amended Hicks Credit Agreement eliminated TRBP's alleged standing, as it believed there were legitimate questions of fact regarding this issue.

### A.    Analysis of Items (2), (3), and (4)

#### 1.    Item (2): Section 548(c) Does Not Prevail as a Matter of Law as a Valid Defense to the Counterclaim

Paradigm has first asserted that section 548(c) of the Bankruptcy Code prevents TRBP

from asserting the Counterclaim.  Specifically, section 548(c) of the Bankruptcy Code provides

that

> (c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation *that takes for value and in good faith* has a lien on or may retain any interest transferred or *may enforce any obligation incurred*, as the case may be, *to the extent that such transferee or obligee gave value to the debtor* in exchange for such transfer or obligation.[167]

The burden of proof is on the defendant transferee (*i.e.*, Paradigm) and the defendant transferee

must demonstrate that it gave value in good faith in exchange for TRBP incurring the

obligation.[168]  In the event these preliminary elements are met, then the relief available under

section 548(c) of the Bankruptcy Code is determined by measuring how much value was given

by the obligee (*i.e.*, Paradigm) to the debtor (*i.e.*, TRBP) in exchange for the obligation (*i.e.*,

TRBP's indebtedness under Agreement #2-the SCSA).[169]

Here, the court finds that Paradigm's section 548(c) defense does not prevail, as a matter

of law, because there are *contested facts issues regarding whether and how much value*

*Paradigm gave*, in exchange for TRBP incurring its obligations under Agreement #2-the SCSA.

For one thing, it could be argued (and, in fact, *is* argued) that TRBP obtained no value or benefit

---

[167] 11 U.S.C. § 548(c) (emphasis added).

[168] *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 799 (5th Cir. 2002).

[169] *See* 11 U.S.C. § 548(c) ("…may enforce any obligation incurred … to the extent that such … obligee gave value to the debtor in exchange for such … obligation"); *see also Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 308 (S.D.N.Y. 2010); *Scarver v. M. Abuhab Participacoes S.A. (In re Moskowitz)*, Adv. No. 10-6650-WLH, 2011 WL 6176210, at *13 (Bankr. N.D. Ga. Nov. 29, 2011).

from Paradigm, by entering into Agreement #2-the SCSA, as TRBP already had a prior oral agreement with HSG to use the Aircraft whenever it wanted, and Agreement #2-the SCSA simply transformed a "freebie" for TRBP into a multi-year obligation owed not only to HSG, but also to Paradigm, as a third-party beneficiary. To be clear, at the time of execution of Agreement #2-the SCSA, Paradigm was obligated under Agreement #1-the 2007 Charter Agreement to provide charter services to HSG and only HSG was obligated to pay for them.[170] HSG and TRBP had their own separate informal, oral agreement relating to charter services that were made available by HSG to TRBP. Pursuant to the terms of Agreement #2-the SCSA, not only did HSG and TRBP transform what had previously been their informal arrangement into a long-term contractual commitment, but also—as argued by Paradigm and ruled on by this court— TRBP became obligated to Paradigm as a third-party beneficiary.[171] Paradigm arguably gave up no additional value in connection with HSG's and TRBP's entry into Agreement #2-the SCSA. In fact, notably, HSG was required to acknowledge that the existence of Agreement #2-the SCSA would have no bearing upon HSG's obligations to Paradigm under Agreement #1-the 2007 Charter Agreement.[172] Thus, while Paradigm has argued that it provided value to TRBP in the form of charter services, it is not at all clear from the summary judgment evidence that Paradigm did anything other than perform its existing obligations to HSG under Agreement #1-the 2007 Charter Agreement—now with an added obligor (TRBP). Again, at a minimum, there are disputed fact issues as to whether and how much value Paradigm gave. To be sure, Paradigm provided use of the Aircraft to TRBP for approximately six months after Agreement #2-the

---

[170] Plaintiff's App. at 48-64 (Agreement #1-the 2007 Charter Agreement).

[171] Plaintiff's App. at 65-92; *see also* the July 2013 Memorandum Opinion.

[172] Plaintiff's App. at 93-111; *see also id.* at 135 (Ireland correspondence to WGM: "It is our overall understanding that HSG remains fully liable for all existing obligations under the existing Aircraft Agreement through its respective termination date unless otherwise released by Paradigm").

SCSA was executed (and this was, no doubt, some significant value). But, at the same time, Paradigm was paid for this usage of the Aircraft by TRBP. In summary, Paradigm's section 548(c) defense does not prevail, as a matter of law, and the court would need to evaluate and weigh the credibility of the disputed evidence relevant to this defense at an ultimate trial.

### 2. Item (3): TRBP's Alleged Ratification of Agreement #2-the SCSA Does Not Estop, as a Matter of Law, TRBP's Assertion of its Counterclaim

Next, Paradigm has argued that the equitable doctrines of ratification and estoppel work together to bar the Counterclaim. Specifically, Paradigm has argued that, because TRBP ratified Agreement #2-the SCSA postpetition and accepted its benefits, TRBP is now estopped (under principles of quasi-estoppel)[173] from essentially attacking Agreement #2-the SCSA, by pursuing the Counterclaim.[174] Paradigm's ratification theory is tied to TRBP's ***postpetition conduct***, such as accepting charter services from Paradigm under Agreement #2-the SCSA, and paying Paradigm directly for those services.

The court has reviewed the various cases cited by both Paradigm and TRBP in its briefing, including *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*,[175] *In re Vallecito Gas,*

---

[173] "Quasi estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, LLP¸* 22 S.W. 3d 857, 864 (Tex. 2000). This form of estoppel applies when it would be unconscionable to allow a party to maintain a position inconsistent with one in which it acquiesced or accepted a benefit. *Id.* To adequately plead a claim under a theory of quasi estoppel, a party must allege (1) the defendant acquiesced to or accepted a benefit under a transaction; (2) the defendant's present position is inconsistent with its earlier position wherein it acquiesced to or accepted the benefit of the transaction; and (3) it would be unconscionable to allow the defendant to maintain its present position, which is to the plaintiff's disadvantage. *Highway 82/Fannin Joint Venture v. Capital One Bank (In re Highway 82/Fannin Joint Venture)*, No. 13-41146, 2014 WL 4416090, at *1 (5th Cir. Sept. 9, 2014). Unlike equitable estoppel, quasi estoppel requires no showing of misrepresentation or detrimental reliance. *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765 (Tex, App.—Texarkana 1992, writ denied); *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex. App.—Houston [14th Dist.] 1991, no writ).

[174] Note, in Paradigm's Reply (*see* DE # 255 in the Adversary Proceeding), Paradigm appears to assert for the first time arguments on ratification and judicial estoppel (as opposed to quasi estoppel). The court considers these to be two separate defenses, and will address Paradigm's judicial estoppel arguments in section V.C below.

[175] *U.S. Bank Nat'l Assoc. v. Verizon Commc'ns., Inc.*, 479 B.R. 405 (N.D. Tex. 2012).

*LLC*,[176] *In re Vision Metals*,[177] *In re Powerburst Corp.*,[178] and *In re Adelphia Recovery Trust*,[179]

and finds that none of these cases directly support Paradigm's ratification/quasi-estoppel defense.

In fact, to the contrary, it is generally held that a debtor cannot ***impliedly*** assume an executory

contract through its postpetition conduct, without complying with section 365(b) and Bankruptcy

Rule 6006 and, among other things, giving notice and opportunity to be heard to parties in

interest.[180] Paradigm's ratification argument is essentially an argument that this is what

happened: that TRBP impliedly assumed Agreement #2-the SCSA by performing under it

postpetition and, thus, it cannot now, essentially, avoid Agreement #2-the SCSA as a fraudulent

transfer. This argument is not legally viable and, even if it were, there would be disputed issues

of fact as to whether TRBP's overall statements and conduct during the case constituted

ratification of Agreement #2-the SCSA, so as to preclude later avoidance of it. In any event, the

---

[176] *Morton v. Kievit (In re Vallecito Gas, LLC)*, 461 B.R. 358 (Bankr. N.D. Tex. 2011).

[177] *Vision Metals, Inc. v. SMS Demag, Inc. (In re Vision Metals, Inc.)*, 325 B.R. 138 (Bankr. D. Del. 2005), *aff'd*, 327 B.R. 719 (Bankr. D. Del. 2005).

[178] *Comm. of Unsecured Creditors v. RG Fin., Ltd. (In re Powerburst Corp.)*, 154 B.R. 307 (Bankr. E.D. Cal. 1993).

[179] *Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust)*, 634 F.3d 678 (2d Cir. 2011).

[180] *See, e.g.*, *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 511-514 (5th Cir. 2000); *see also Data–Link Systems, Inc. v. Whitcomb & Keller Mortg. Co. (In re Whitcomb & Keller Mortgage Co.)*, 715 F.2d 375, 380 (7th Cir. 1983) (an assumption of a contract under section 365 of the Bankruptcy Code cannot be implied); *United States ex rel. U.S. Postal Serv. v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 624 (8th Cir.1994) (making clear that under § 365(a), rejection is "subject to the court's approval," and that a debtor seeking such approval must proceed by motion upon reasonable notice and opportunity for hearing); *In re Gateway Apparel, Inc.*, 238 B.R. 162, 164 (Bankr. E.D. Mo. 1999) ("To be approved by the Court, the intention to assume must be clearly declared by the Debtor In Possession or Operating Trustee; and notice of this intention must be given to the necessary parties."); *In re 1 Potato 2, Inc.*, 182 B.R. 540, 542 (Bankr. D. Minn. 1995) ("Bankruptcy Rule 6006(a) provides that a proceeding to assume or reject an unexpired lease is governed by Bankruptcy Rule 9014 which in turn states that such relief shall be requested by motion with reasonable notice and opportunity for hearing."); *In re United Nesco Container Corp.*, 47 B.R. 230, 233 (Bankr. E.D. Pa. 1985) (stating that proceeding to reject unexpired lease, other than as part of plan, is "contested matter," in which relief is requested by motion); *In re Child World, Inc.*, 147 B.R. 847, 852 (Bankr.S.D.N.Y.1992) (assumption of a contract may not be implied because it requires specific court approval pursuant to a motion in accordance with Rule 6006).

---

**MEMORANDUM OPINION AND ORDER**

cases cited by Paradigm either: (a) do not involve Chapter 5 causes of action;[181] (b) involve derivative Chapter 5 causes of action that hinge upon the existence of a "triggering" creditor's own avoidance rights;[182] (c) provide for a general proposition regarding ratification/estoppel, but have no real applicability to avoidance actions (but are nevertheless issued by a bankruptcy court);[183] or (d) involve facts in which postpetition creditor ratification was considered, but which was rejected in favor of *res judicata*, waiver, or judicial estoppel.[184]  Accordingly, Paradigm's ratification/estoppel argument does not prevail, as a matter of law, and summary judgment is denied on to this particular defense.

### 3.  Item (4): Unclean Hands Defense Does not Prevail, as a Matter of Law

Next, Paradigm argues that TRBP's alleged "unclean hands" preclude it from asserting the Counterclaim as a matter of law.   Specifically, Paradigm has argued that TRBP has dirtied its own hands, by secretly and fraudulently concealing its plans to terminate the SCSA, illegally terminating the SCSA without Paradigm's knowledge or consent, and attempting to circumvent proper procedures under section 365 of the Bankruptcy Code, via its partial assumption and

---

[181] *See, e.g., Powerburst Corp.*, at 313 (Bankr. E.D. Cal. 1993) (a creditors committee sought to recover payments a debtor made on criminally usurious notes and the adverse party claimed the payments had ratified the notes. However, because the notes were illegal and void, not voidable, the payments could not ratify them).

[182] *See, e.g., Verizon Commc'ns.*, 479 B.R. at 414-15 (court held that under Section 544(b), the bankruptcy trustee's ability to avoid [a] transfer comes from the existence of a "triggering" creditor that could have brought a state law fraudulent transfer claim at the time of the filing of the bankruptcy petition. In contrast, [under Section 548] there is no requirement that that there be such a "triggering" creditor at all. Instead, Section 548 is a simple grant of power to the bankruptcy trustee to avoid transfers under certain circumstances. Accordingly, the court held that defendant's ratification and estoppel arguments concerning debtor's banks and bondholders were irrelevant under Section 548).

[183] *See, e.g., Vallecito Gas, LLC,* 461 B.R. at 375 (quoting authority for principle that contract that "is neither wrong in itself nor against public policy . . . is . . . valid until avoided . . . and . . . subject to ratification and estoppel" but failing to apply such principle to a section 548 fraudulent transfer claim).

[184] *See, e.g., Adelphia Recovery Trust*, 634 F.3d at 697-98 (finding debtor's solicitation of court approval of transactions amounted to res judicata and judicial estoppel precluding 548 claims); *Vision Metals, Inc.*, 325 B.R. at 146-147 (waiver and judicial estoppel principles precluded a debtor's 548 action based upon its post-petition assumption of the contract it later sought to avoid).

partial rejection of the SCSA. However, Paradigm's unclean hands defense has a similar problem as its ratification/estoppel defense.

For one thing, notably, Paradigm has cited no cases (and the court can find none), in which the ***postpetition*** conduct of a debtor-in-possession has provided a basis for application of the unclean hands defense to preclude the prosecution of a fraudulent transfer claim brought under section 548 of the Bankruptcy Code.[185] Given the very nature of a debtor-in-possession's role in a bankruptcy case, and the level of court and creditor oversight at play, it is not surprising to the court that there is no supportive case law as to this defense. Moreover, an "unclean hands" defense, even if somehow viable, would be very fact intensive, as to who said and did what, and when, and there would appear to be disputed facts that the court would need to hear, through live witnesses to assess credibility. In summary, Paradigm must be denied summary judgment on this defense.

**B.     Item (5): Paradigm's Defense that there was a Release of TRBP's Counterclaim Against Paradigm Under the HSG Settlement Agreement Does Not Prevail, as a Matter of Law**

Under the HSG Settlement Agreement, TRBP broadly released any and all claims and actions against Hicks, HSG, and any of their related companies or "affiliates" arising from a litany of filings and lawsuits, including claims arising out of, or related in any manner whatsoever to TRBP's bankruptcy case (the "Release"). To be clear, Paradigm was not a signatory to the Release or involved in any way with the HSG Settlement Agreement. But,

---

[185] The most analogous case the court has found is *Adelphia Recovery Trust*, 634 F.3d at 697-98 (cited in the preceding footnote—although this is not exactly on point). It is also worth noting that courts in this district have ***not*** allowed an *in pari delicto* defense (*i.e.*, an equitable affirmative defense, that a defendant may assert against a plaintiff, if the plaintiff has acted equally or more wrongly than the defendant, through conduct relating to the plaintiff's claim) to section 548 claims with respect to ***prepetition conduct***. *See, e.g., O'Cheskey v. Horton (In re American Hous. Found.)*, Adv. No. 10–02018. 2011 WL 4625349, at *32-33 (Bankr. N.D. Tex. Sept. 30, 2011) (emphasis added), *aff'd* 2012 WL 11851620, at * 7 (N.D. Tex. Sept. 14, 2012). Paradigm's "unclean hands" defense seems analogous to an *in pari delicto* defense, but in a postpetition context—which seems even more difficult for a defendant to argue than in a ***prepetition*** context, as there has been court and creditor oversight in a postpetition context.

relying on the language of the Release, Paradigm has argued that, in addition to HSG, Paradigm was released from all causes of actions and claims that TRBP could bring against Paradigm related to TRBP's entry into Agreement #2-the SCSA, including the Counterclaim.  Specifically, Paradigm argues that Hicks owns (or owned) 100% of Hicks SportsJet and, therefore, Hicks SportsJet is a released affiliate of Hicks.  Hicks SportsJet, in turn, owns (or owned) 50% of SW SportsJet, making SW SportsJet a released Hicks affiliate.  Finally, SW SportsJet's only business was leasing the Aircraft to Paradigm. Thus, Paradigm, who "operated the business or substantially all of the property of the debtor under a lease" is also a released Hicks affiliate, which would bar the Counterclaim against it.  In other words, Paradigm has essentially argued that Paradigm itself is ***an affiliate of an affiliate of an affiliate*** (essentially, an affiliate thrice removed) and that this relationship qualifies it as a released party under the HSG Settlement Agreement.[186]

First, the court notes that the HSG Settlement Agreement is governed by Texas law.  The HSG Settlement Agreement does not define the term "affiliate," and applying Texas law, as is required, the most appropriate source of guidance is the Texas Business Organizations Code (the "TBOC").[187]  Under the TBOC, an "affiliate" is defined as "a person who controls, is controlled by, or is under common control with another person."[188]  Here, in order to qualify as an affiliate under the HSG Settlement Agreement, Paradigm would need to demonstrate that Paradigm is either controlled by or under common control with Hicks.  However, the undisputed facts do not demonstrate that this type of relationship existed between Paradigm and Hicks.  Rather, the

---

[186] *See* Appendix A (attached hereto).

[187] While Paradigm has argued that the court ought to apply the definition of "affiliate" as set forth in section 101(2) of the Bankruptcy Code, the court believes that the more appropriate route is to use the definition as set forth in the Texas Business Organizations Code, as the court is examining whether Paradigm qualifies as an affiliate under an agreement that parties thereto expressly agreed would be governed by state law.

[188] Tex. Bus. Org. Code § 1.002(1) (West 2013).

undisputed facts appear to show that, at a minimum, Paradigm might be an affiliate of an affiliate of an affiliate, and the court does not believe that, as a matter of law, this type of relationship qualified Paradigm as an "affiliate of Hicks" under the HSG Settlement Agreement.

However, even if this court were to find that Paradigm did qualify as an "affiliate of Hicks" as a matter of law, the court finds that there is a fact issue with regard to whether the language of the Release would include the causes of action in the Adversary Proceeding (including the Counterclaim) and, specifically, whether TRBP intended to release claims and causes of action it had with respect to Agreement #2-the SCSA. As explained by the Texas Supreme Court, "[i]n order to effectively release a claim in Texas, the releasing instrument must 'mention' the claim to be released."[189] Claims not clearly within the subject matter of the release are not discharged, even if those claims exist when the release is executed.[190] However, the release need not specifically describe a particular cause of action.[191] Finally, whenever a release is before a court, the court will ascertain and give effect to the intention of the parties as of the time of execution of the release.[192] In ascertaining the intent of the parties, the release will be considered as a whole and read in the light of the facts and surrounding circumstances.[193]

Here, it is an uncontested fact that there is absolutely no mention of the Adversary Proceeding, the Counterclaim, Agreement #2-the SCSA, Paradigm, or the Aircraft in the HSG

---

[189] *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991).

[190] *Id.*; *see also Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 20 S.W.3d 692, 698 (Tex. 2000).

[191] *Mem'l Med. Ctr. of E. Tex. v. Keszler*, 943 S.W.2d 433, 434-35 (Tex. 1997); *D.R. Horton-Texas, Ltd. v. Savannah Props. Assocs., L.P.*, 416 S.W.3d 217, 226 (Tex. App.—Fort Worth 2013, no pet.).

[192] *Id.*; *Boales v. Brighton Builders, Inc.*, 29 S.W.3d 159, 167 (Tex. App.—Houston [14th Dist.] 2000).

[193] *Tricentrol Oil Trading, Inc. v. Annesley*, 809 S.W.2d 218, 221 (Tex. 1991); *Loy v. Kuykendall*, 347 S.W.2d 726, 728 (Tex. Civ. App.—San Antonio 1961, writ refused n.r.e.); *City of Brownsville ex rel. Public Utilities Bd. v. AEP Tex. Cent. Co.*, 348 S.W.3d 348, 354 (Tex. App.—Dallas 2011, pet. denied); *Ranger Ins. Co. v. Ward*, 107 S.W.3d 820, 827 (Tex. App.—Texarkana 2003, pet. denied); *Boales*, 29 S.W.3d at 167.

**MEMORANDUM OPINION AND ORDER** **PAGE 52**

Settlement Agreement. However, in a pleading filed by TRBP on October 23, 2103, TRBP

stated

> the TRBP Parties, the First Lien Agent, Hicks, BRE, HSG Holdings, HSG, and certain additional parties entered into a Settlement Agreement, dated as of January 7, 2013 (the "Settlement Agreement"). . . . Pursuant to the Settlement Agreement, TRBP and HSG granted releases to one another.
>
> HSG contends that TRBP released its third-party claim against HSG in this adversary proceeding pursuant to the releases contained in the Settlement Agreement. While TRBP disagrees with HSG's position, the reality is that the Avoidance Claim in the context of this case (and given the Court's rulings on the Dispositive Motions) is only relevant to the claims asserted by the Paradigm Parties against TRBP under the SCSA [Agreement #2-the SCSA]—obligations that the Court has ruled TRBP incurred for the benefit of the Paradigm Parties as third-party beneficiaries—and whether those claims are avoidable. . . .
>
> Based upon the foregoing, TRBP requests entry of an order dismissing HSG as a party to this adversary proceeding . . .[194]

Additionally, TRBP's request to dismiss HSG from the Adversary Proceeding was also premised

on the court entering an order providing

> that such dismissal shall not affect in any manner the Avoidance Claim against the Paradigm Parties seeking to avoid the Paradigm Parties' claims against TRBP under the SCSA as obligations that the Court has ruled TRBP incurred for the benefit of the Paradigm Parties as third-party beneficiaries.[195]

Inclusion of this language was objected to by Paradigm, and this court did not ultimately include

such language in its Order Dismissing Third-Party Defendant HSG Sports Group LLC.[196] Thus,

on the one hand, TRBP has argued that the HSG Settlement Agreement would not release any

claims or causes of actions related to TRBP's entry into Agreement #2-the SCSA; however, on

the other hand, TRBP requested dismissal of HSG from the Adversary Proceeding, based on

what this court believes to be the Release contained in the HSG Settlement Agreement. Based

on these conflicting facts, it is not clear to this court, from the record before it, whether the

---

[194] *See* DE # 218 in the Adversary Proceeding.

[195] *Id.*

[196] *See* DE ## 223 and 233 in the Adversary Proceeding.

**MEMORANDUM OPINION AND ORDER** **PAGE 53**

Release was intended to encompass the Counterclaim. Specifically, whether the language "actions arising out of the Bankruptcy Case" encompassed causes of action relating to TRBP's entry into Agreement #2-the SCSA. The court believes that this is ultimately a fact issue, that would need to be resolved at trial, including testimony from TRBP regarding its intent behind the language of the Release, and accordingly, summary judgment would not be appropriate at this time.

### C. Item (1): Paradigm's Judicial Estoppel Defense to the Counterclaim—the Argument, the Theory, and Does this Really Apply Here?

Paradigm's first argument—which this court now addresses last—is, in the court's view, the most relevant and significant of all of Paradigm's arguments (although it slightly misses the mark, in this court's estimation). Specifically, Paradigm has argued that TRBP's Amended Disclosure Statement that was approved by the court, and which accompanied TRBP's original plan, *waived all causes of action including avoidance actions*, and that this fact now judicially estops TRBP from pursuing any section 548 avoidance actions against Paradigm.

Judicial estoppel, also known as the "doctrine of the conclusiveness of the judgment"[197] or the "doctrine of preclusion of inconsistent positions,"[198] is a "judicially created doctrine" that seeks to prevent a litigant from asserting a position that is inconsistent with one asserted in the same or a previous proceeding. Moreover, judicial estoppel "is concerned not with the repose of individual claims but with the ability of courts to render their decisions based on faithful representations by counsel."[199] The doctrine's purpose is "to protect the integrity of the judicial process" by "prevent[ing] parties from playing fast and loose with the courts to suit the

---

[197] BLACK'S LAW DICTIONARY (9th ed. 2009).

[198] *Id.*

[199] *Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust)*, 634 F.3d 678, 697 (2d Cir. 2011).

**MEMORANDUM OPINION AND ORDER**              **PAGE 54**

exigencies of self-interest."[200]  In order for judicial estoppel to apply, three requirements must be

satisfied: (1) the party's position must be clearly inconsistent with the position previously taken

by the party; (2) the court must have accepted the previous position; and (3) the previous position

(or non-disclosure) must not have been inadvertent.[201]  Here, to be more specific, Paradigm has

argued that judicial estoppel bars TRBP's Counterclaim because: (1) TRBP, through its

Amended Disclosure Statement, unequivocally declared to the court and all parties-in-interest

that it was waiving and releasing all Chapter 5 avoidance actions, including those under section

548—then later, through a modified plan that was later confirmed by this court, switched gears

and attempted to retain Chapter 5 avoidance actions without adequate notice to those affected;

and, additionally (2) TRBP stated in the Amended Disclosure Statement, First Amended Plan

and Confirmation Hearing Notice that it would be assuming and assigning the *unamended*

Agreement #2-the SCSA to Baseball Express, then later, switched gears and attempted to amend

Agreement #2-the SCSA, without adequate notice to Paradigm.

> **1.     Is TRBP Judicially Estopped From Asserting the Counterclaim Based
> on its Failure to Retain Chapter 5 Causes of Action in the Approved
> Disclosure Statement and First Amended Plan (the Latter of Which
> was Eventually Modified to Retain the Causes of Action)?**

Before examining Paradigm's judicial estoppel arguments, the court must first examine a

threshold issue of TRBP's *standing* to assert the Counterclaim under the retention language

contained in the Confirmed Plan.[202]  Whether or not TRBP has *standing* to assert the

---

[200] *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 205 (5th Cir. 1999).

[201] *Superior Crewboats, Inc. v. Primary P&I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330, 335 (5th Cir. 2004).

[202] Note that Paradigm raised a standing defense, with regard to the Avoidance Complaint, early on in this Adversary Proceeding, in its Rule 12(b)(6) Motion that this court early denied.  However, that was a different standing defense than the one now being addressed.  Specifically, early on, Paradigm argued that TRBP lacked standing to bring the Avoidance Complaint, because creditors were being paid in full in this case.  This court found this earlier standing argument to lack merit, relying on certain Fifth Circuit authority discussed in this court's July

Counterclaim in the first place potentially impacts whether or not judicial estoppel could even apply.

In general, when a Chapter 11 reorganization plan is confirmed by a bankruptcy court, the debtor loses its debtor-in-possession status and, with it, potentially ***standing*** to pursue estate claims.[203]  Section 1123(b)(3) of the Bankruptcy Code, however, allows a debtor to retain standing to pursue causes of action possessed by the bankruptcy estate by providing for the retention of such claims in its reorganization plan.[204]  One of the options available to a debtor, under section 1123(b)(3) of the Bankruptcy Code, is to reserve some or all of its claims to a liquidating trustee or other estate representative, appointed pursuant to a Chapter 11 plan, who then pursues the claims for the benefit of creditors post-confirmation.[205]  After the reorganization plan is confirmed by the bankruptcy court, the debtor (or its representative) will have standing to bring claims that the debtor reserved in the reorganization plan, but will not have standing to bring claims that were not reserved in the plan.[206]  The plan language can essentially operate to "pass the baton" to some appropriate party post-confirmation to pursue estate causes of action that might otherwise be lost when there is no more bankruptcy estate.

---

2013 Memorandum Opinion.  The standing issue that is now addressed herein deals with whether the Counterclaim was adequately preserved in TRBP's plan, so that it may now be pursued.

[203] *Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355 (5th Cir. 2008).

[204] *See* 11 U.S.C. § 1123(b)(3) (a plan may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any claim or interest").

[205] *Compton v. Anderson (In re MPF Holdings US LLC)*, 701 F.3d 449, 453-54 (5th Cir. 2012) (citing *Torch Liquidating Trust  v. Stockstill*, 561 F.3d 377, 387 (5th Cir. 2009) ("Section 1123 therefore allows a plan to transfer to a trustee of a liquidating trust the authority to enforce an estate's claims ... and to distribute the proceeds of successful suits.")); *McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335 (5th Cir. 1995) (holding that § 1123(b)(3) "allows a plan to transfer avoidance powers" to a liquidating trust that will "pursue avoidance actions on behalf of unsecured creditors").

[206] *MPF Holdings*, 701 F.3d at 453 (citing *United Operating*, 540 F.3d at 355).

**MEMORANDUM OPINION AND ORDER**                                    **PAGE 56**

As to the type of language needed to "pass the baton" on estate claims, the Fifth Circuit in *United Operating LLC* held that a reorganization plan must contain a "specific and unequivocal" reservation in order for the debtor to have standing to pursue a claim post-bankruptcy—blanket reservations of "any and all claims" are insufficient.[207] Though the degree of specificity involved in a plan's reservation of claims will often vary, the reservation must, at a minimum, be specific enough to put "creditors on notice of any claim [the debtor] wishes to pursue after confirmation."[208] This notice "allows creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it."[209] "[A]bsent specific and unequivocal retention language in the plan, creditors lack sufficient information regarding their benefits and potential liabilities to cast an intelligent vote."[210] Moreover, the bankruptcy court is permitted to consult both the disclosure statement in addition to the plan to determine whether the retention language is "specific and unequivocal."[211] In short, while the Fifth Circuit phrases this issue as being all about "standing," the concept of notice seems to be a significant part of the Fifth Circuit's analysis in these standing cases—suggesting that the issue is really more one of judicial estoppel than standing (more to follow).

Here, it is undisputed that the Amended Disclosure Statement (approved by the court on June 21, 2010) and the Confirmed Plan (which had been modified multiple times and was confirmed on August 5, 2010) ***had conflicting language*** with regard to the retention of potential Chapter 5 actions. Specifically, section 5 of the Amended Disclosure Statement provided that:

---

[207] *Id.*

[208] *Id.*

[209] *Id.*

[210] *Spicer v. Laguna Madre Oil & Gas II, L.L.C. (In re Tex. Wyo. Drilling, Inc.)*, 647 F.3d 547, 550 (5th Cir. 2011) (citation omitted).

[211] *Id.*

**MEMORANDUM OPINION AND ORDER**                                    **PAGE 57**

"to the extent not already otherwise waived pursuant to another order of the Bankruptcy Court, effective as of the Effective Date, the Debtor will be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable law that belong to the Debtor."[212]  This language was fully consistent with section 11.5 of the original (First Amended Plan), that the approved Amended Disclosure Statement accompanied, which had provided that: "effective as of the Effective Date, the Debtor shall be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or other applicable law that belong to the Debtor."[213]  However, it is also undisputed that the First Amended Plan, as earlier mentioned, was *modified (multiple times),* in connection with the auction process that unfolded during the bankruptcy case, and the Confirmed Plan ultimately not only *deleted* the waiver of Chapter 5 causes of action, but also *included* a provision whereby TRBP *expressly retained* all claims, rights or causes of action, suits, and proceedings, including but not limited to claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code, with such claims or causes of action later-to-be listed on a Schedule 13.5 to the Confirmed Plan.[214]  Schedule 13.5 to the Confirmed Plan (as mentioned earlier) was not actually attached to the Confirmed Plan when it was confirmed on August 5, 2010, but was filed for the first time on August 23, 2010, as an attachment to the amended findings of fact and conclusions of law that were entered that day.  The "Retained Causes of Action" on that

---

[212] *See* DE # 254-1 in the Bankruptcy Case, p. 54.

[213] *See* DE # 254-2 in the Bankruptcy Case, p. 32.

[214] *See* Defendant's App. at 563.  To be clear, TRBP's third amended plan was the first filed version of the plan to retain causes of action, and the fourth amended plan (also with retention of causes of action) ultimately became the Confirmed Plan.

**MEMORANDUM OPINION AND ORDER**                    **PAGE 58**

Schedule 13.5 were described as "Causes of action relating to TRBP's entry into, transaction of and performance under certain transfers and transactions described as the Midnight Transfers or Eve of Filing Transactions (some of which are as detailed in the Joint Brief Regarding Certain Issues Related to Proposed Plan of Reorganization and Disclosure Statement, filed by the Lender Parties on June 11, 2010), including, but not limited to, constructive and intentional fraudulent transfer and breach of fiduciary duty."[215]

This court believes that the Confirmed Plan contained the "specific and unequivocal" language necessary for TRBP to have preserved standing to assert the Counterclaim under *United Operating's* "specific and unequivocal" standard—even without the Schedule 13.5 that was not filed until 18 days after confirmation. The Fifth Circuit elaborated, after *United Operating,* that parties do not have to be identified individually to maintain standing, and the plan proponent does not have to indicate a lawsuit will be filed—simply saying it ***might*** be filed is enough.[216] In any event, the Amended Disclosure Statement clearly did ***not*** contain specific and unequivocal language retaining causes of action—in fact, it ***waived*** the Debtor's right to bring post-confirmation chapter 5 causes of action. Does this fact ultimately defeat TRBP's standing in asserting the Counterclaim? Unfortunately, the Fifth Circuit authority does not, in this court's estimation, clearly provide an answer.

Section 1125 of the Bankruptcy Code entitles creditors to "adequate information" so they can make an informed decision on whether to accept or reject a chapter 11 plan.[217] Moreover, a disclosure statement is an informational document generally regarded as being intended to provide those who are entitled to ***vote*** on a plan with sufficient information to make an informed

---

[215] *See* Defendant's App. at 572.

[216] *MPF Holdings*, 701 F.3d at 453.

[217] *Tex. Wyoming Drilling, Inc.*, 647 F.3d at 551.

decision.[218]  Moreover, as stated above, language in many of the decisions of the Fifth Circuit provide that "specific and unequivocal" reservation language "allows creditors to determine whether a proposed plan resolves matters satisfactorily before they **vote** to approve it," and "absent specific and unequivocal retention language in the plan, creditors lack sufficient information regarding their benefits and potential liabilities to cast an intelligent **vote**."[219]  Thus, the specific and unequivocal language needed to retain causes of action under a plan appears to be most focused at giving notice to creditors who are actually entitled to **vote** on a plan.  Here, under both the original plan accompanying the Amended Disclosure Statement (approved by the court on June 21, 2010), and the modified Confirmed Plan, all classes under the plan were unimpaired (*i.e.,* would be paid in full) and did not have a right to vote, with the possible exception of the classes comprised of the Lenders' claims and the interests of the Rangers Equity Entities.  Unimpaired creditors are not entitled to solicitation under sections 1126(f) and (g) of the Bankruptcy Code and are deemed to have accepted the plan.[220]  As a modified plan becomes the confirmed plan pursuant to section 1127(a) of the Bankruptcy Code, this maxim applies equally to plans as modified.[221]  Thus, arguably whether or not the Confirmed Plan retained Chapter 5 causes of action or not is really of no consequence to Paradigm, because Paradigm was not a voting creditor.  This court has earlier held Paradigm to be a third-party beneficiary of an executory contract (*i.e.,* Agreement #2-the SCSA) in this court's July 2013 Memorandum

---

[218] *See* 11 U.S.C. § 1125(b) ("An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder [among other things] a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information").  *See also* 11 U.S.C. § 1125(a)(1) (defining "adequate information" as information of a kind "that would enable  . . a hypothetical investor of the relevant class to make an informed judgment about the plan").

[219] *United Operating*, 540 F.3d at 355; *Tex. Wyo. Drilling, Inc.*, 647 F.3d at 550; *Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring)*, 714 F.3d 860, 864 (5th Cir. 2013).

[220] *See* 11 U.S.C. § 1126 (f) & (g).

[221] *In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988).

**MEMORANDUM OPINION AND ORDER**                                      **PAGE 60**

Opinion. Even if Paradigm had already been allowed some level of claim against TRBP at the time of plan confirmation, Paradigm would not have been a *voting* creditor. All creditors were unimpaired. Nevertheless, there is at least one Fifth Circuit decision that appears to imply that standing (and the level of disclosure of causes of action in a plan and disclosure statement) are not merely relevant as to *voting creditors*.

In *National Benevolent Association*, an unpublished decision issued shortly after *United Operating*, a reorganized debtor sued the law firm that represented it before and during bankruptcy (Weil Gotshal & Manges, LLP) for malpractice based on the firm's pre-bankruptcy conduct.[222] The law firm argued that the reorganization plan only reserved causes of action relating to its representation of the debtor *during* the bankruptcy, while the debtor argued that the plan reserved causes of action relating to the law firm's legal work both *before and during* the bankruptcy.[223] The Fifth Circuit did not decide which party's reading of the reorganization plan was the preferred one, and instead, "merely conclude[d] that the plan's provisions d[id] not specifically and unequivocally reserve to [the debtor] the right to prosecute its claim against [the law firm] arising out of the alleged attorney misconduct that occurred prior to the ... bankruptcy petition filing and proceedings."[224] While the holding does not necessarily add much to what the Fifth Circuit had already held regarding the "specific and unequivocal" language standard, what is interesting (to this court at least) is that Weil Gotshal & Manges, LLP was permitted to raise the issue of standing even though it had *not* been a creditor entitled to vote on the plan. Moreover, equally interesting is the fact that it was the law firm that had drafted the plan. In any

---

[222] *Nat'l Benevolent Ass'n of the Christian Church (Disciples of Christ) v. Weil, Gotshal, & Manges, LLP (In re Nat'l Benevolent Ass'n of the Christrian Church (Disciples of Christ))*, 333 Fed. Appx. 822, 825 (5th Cir. 2009).

[223] *Id.* at 827-28.

[224] *Id.* at 828–29.

**MEMORANDUM OPINION AND ORDER**                                              **PAGE 61**

event, *National Benevolent* arguably conflicts with the language of other Fifth Circuit cases that suggest that the "specific and unequivocal" standard is all about giving creditors who ***vote*** on the plan adequate notice of retained causes of actions. *National Benevolent* arguably suggests that other parties-in-interest (not just voting creditors) may be permitted to raise the issue of standing as well.[225]

Although the Fifth Circuit has not clearly answered the question of whether the "specific and unequivocal" standard applies to parties-in-interest who do not vote on a plan, it should be noted that Paradigm has not framed its argument in terms of ***standing***, but rather as an issue of ***judicial estoppel***. Perhaps this is because, in the case at bar, it is not a matter of the confirmed plan having failed to have specific and unequivocal language retaining avoidance actions. Rather—even without the tardily filed Schedule 13.5—the plan that was ultimately approved by the confirmation order clearly and unequivocally stated that chapter 5 avoidance actions would be retained. So, the court concludes that standing is not a problem. The potential problem is that the Amended Disclosure Statement (and order approving it–along with the original plan that the approved disclosure statement described) contained no retention of avoidance actions. It was inconsistent with the Confirmed Plan. Paradigm argues that this is a judicial estoppel problem. Essentially, this was a situation of a party (TRBP) obtaining one order from the bankruptcy court while representing one thing ("we ***will not*** bring avoidance actions"—resulting in an order

---

[225] *See also Tex. Wyo. Drilling,* 647 F.3d at 550 (Fifth Circuit rather swiftly disposed of lack-of-standing argument, raised by a former shareholder of the debtor who was being sued in a fraudulent transfer action, concluding that disclosure statement sufficiently identified the prospective defendant when it provided that "various prepetition shareholders of the Debtor" might be sued for "fraudulent transfers and recovery of dividends paid to shareholders"; the court never noted that shareholders (whose equity was cancelled under the plan) would not have been entitled to vote for or against the plan); *United Operating,* 540 F.3d at 355 (although reasoning of decision strongly suggests that plan language retaining causes of action must be clear so as to put "creditors on notice of" claims that debtor wishes to pursue and "[p]roper notice allows creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it," Fifth Circuit nevertheless held that Reorganized Debtor did not have standing to bring common law claims against not only a secured creditor, but also a loan officer of the creditor, a company (Wildcat) that had been appointed by the court to operate debtor's oil and gas properties, and one of Wildcat's principals—the three latter of which defendants presumably would not have been creditors of the debtor entitled to vote).

approving disclosure statement), and obtaining yet another order from the bankruptcy court while representing another thing ("we *will* indeed bring avoidance actions"—resulting in the confirmation order approving the plan).

Ultimately, the court does not believe the equitable remedy of judicial estoppel should be applied in this context. As stated above, judicial estoppel is really concerned about preventing parties from playing fast and loose with the courts. The classic example of judicial estoppel, in the bankruptcy context, is where a debtor fails to list a potential cause of action in its schedules and statement of financial affairs during the bankruptcy case, and then seeks to assert such cause of action post-confirmation.[226] This is quite different from the situation that occurred here and in many other chapter 11 cases, where a plan gets modified after the approval of the disclosure statement and prior to confirmation, to change part of the reorganization strategy and treatments, and then the plan proponent seeks confirmation of the plan, as modified. In such situations, the bankruptcy court must simply look at the modifications, and look to the language in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and decide if the plan, as modified, can be confirmed or if it, potentially, needs further notice and disclosure to creditors and equity holders who have previously accepted the plan. This largely boils down to whether there is an adverse change to the treatment of a creditor or equity security holder who has not accepted, in writing, the modification. Here, voting definitely becomes relevant. It is clear from Bankruptcy Code section 1127 and Bankruptcy Rule 3019 that voting is relevant when it comes to plan modifications. In other words, bankruptcy courts must analyze whether a plan modification requires new notice and voting or not. On balance, this court does not believe that TRBP is barred under principles of judicial estoppel from asserting the Counterclaim, based on the

---

[226] *See, e.g., Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330, 335 (5th Cir. 2004); *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 207-213 (5th Cir. 1999).

**MEMORANDUM OPINION AND ORDER** **PAGE 63**

differences between the Amended Disclosure Statement (approved June 21, 2010) and the

Confirmed Plan (approved August 5, 2010). With regard to the change from waiver to retention

of chapter 5 causes of action in these two documents, TRBP was simply making plan

modifications in the June-August 2010 time frame that had been demanded by certain creditors

(TRBP's Lenders), which modifications did not adversely affect voting creditors. Judicial

estoppel is not a viable defense.

> **2.    Is TRBP Judicially Estopped From Asserting the Counterclaim
> Because it Stated in the Amended Disclosure Statement, First
> Amended Plan, and the Confirmation Hearing Notice That it Would
> be Assuming and Assigning Agreement #2-the SCSA?**

Paradigm has additionally argued that TRBP should be judicially estopped from asserting

the Counterclaim, because it stated in the Amended Disclosure Statement, the First Amended

Plan and the Confirmation Hearing Notice that it would be assuming and assigning the

*unamended* Agreement #2-the SCSA to Baseball Express. Then, ultimately, TRBP switched

gears and the Confirmed Plan provided for the assumption and assignment of the SCSA *as

amended*.

This court, of course, previously ruled, in the First Round of Motions for Summary

Judgment (*i.e.,* in the July 2013 Memorandum Opinion), that Agreement #3-the Amendment to

the SCSA was invalid as a matter of contract law. And, as a result, TRBP had breached

Agreement #2-the SCSA, of which Paradigm was a third-party beneficiary. Thus, Paradigm

would have breach of contract damages. TRBP, thus, now seeks to pursue the Counterclaim—

arguing that Agreement #2-the SCSA (which it earlier in the case wanted to assume and assign—

then later wanted to amend then assume and assign) must be avoided as a fraudulent transfer.

All of this, in Paradigm's view, amounts to TRBP playing fast and loose with the court and

judicial estoppel should apply to bar the Counterclaim. This court agrees with Paradigm that

TRBP is barred now from pursuing the Counterclaim as a matter of law, albeit for slightly different reasons.

### a.    Agreement #2-the SCSA was an Executory Contract, as to Which TRBP Did Not Follow Proper Bankruptcy Protocol.

The court starts with the acknowledgment that Agreement #2-the SCSA was an executory contract (a prepetition agreement between TRBP and HSG, on which Paradigm was a third-party beneficiary, in which the parties and third-party beneficiary all had material ongoing rights, duties, and obligations).  Moreover, TRBP did not follow proper Bankruptcy Code protocol when dealing with this executory contract.  The Bankruptcy Code, of course, generally provides that a debtor-in-possession may:  (a) assume (or assume and assign); or (b) reject an executory contract.  Section 365 and Bankruptcy Rule 6006 prescribe the proper protocol.[227]  The assumption or rejection decision of a debtor-in-possession is subject to court approval, pursuant to section 365(a).  And assumption, pursuant to section 365(b), or assumption and assignment, pursuant to section 365(f), require certain standards to be met by the debtor-in-possession—such as the debtor must cure defaults under the executory contract and must provide adequate assurance of future performance under the contract.  This can all be accomplished as part of a plan or with a motion, but it is clear that ***notice*** must be given to the other party to the contract, as well as other parties in interest as the court may direct.[228]  Moreover, the law is clear that a debtor cannot pick and choose portions of an executory contract it wishes to assume.  Where a debtor assumes an executory contract, it must assume the entire contract, "*cum onere*," *i.e.,* the debtor accepts both the obligations and the benefits of the executory contract. [229]

---

[227] 11 U.S.C. § 365(a), (b), and (f).

[228] Fed. R. Bankr. Pro. 6006.

[229] *See Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 506 (5th Cir. 2000).

**MEMORANDUM OPINION AND ORDER**                                    **PAGE 65**

Here, TRBP was attempting to pick and choose what it wanted to keep with regard to Agreement #2-the SCSA. Midway through the bankruptcy case, TRBP realized (in discussions with Baseball Express and perhaps others) that Baseball Express and, perhaps, other competing bidders, only wanted to have usage of the Aircraft through the 2010 season—not through 2017 as the contract provided. So Agreement #2-the SCSA, in TRBP's view, could be amended to change the duration of the contract to end at the conclusion of the 2010 baseball season. Thus, Agreement #2-the SCSA would only be assumed and assigned to Baseball Express as amended. But this is not proper bankruptcy protocol. It does not work unless all parties to the contract agree. The Fifth Circuit has made this clear in its *Nat'l Gypsum* decision from the year 2000.[230] TRBP was required to assume the Agreement #2-the SCSA in full, or reject it in full. A debtor may not merely accept the benefits of a contract and reject the burdens to the detriment of the other party.[231] This court earlier held that Agreement #3-the Amendment to the SCSA was invalid and unenforceable against Paradigm, the third-party beneficiary under Agreement #2-the SCSA, as a matter of contract law. But to be clear, Agreement #3-the Amendment to the SCSA was also invalid as a matter of bankruptcy law—since it circumvented section 365 of the Bankruptcy Code and the principles of *Nat'l Gypsum*.

But perhaps even more importantly, even if partial assumption (or amending and assuming) of Agreement #2—the SCSA was permissible, TRBP did not follow proper protocol, in that it never gave Paradigm the proper, required ***notice*** of its intentions with regard to the Aircraft agreement.[232] TRBP never gave adequate notice that it was switching gears—and was

---

[230] *Id.*

[231] *Chira v. Saal (In re Chira)*, 367 B.R. 888, 899 (S.D. Fla. 2007) (quoting *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985)).

[232] *Nat'l Gypsum*, 208 F.3d at 511-513 (debtor has responsibility to assure that non-debtor party was on notice of the debtor's specific intent to assume the contract, which includes delivery of proposed plan of reorganization or some other court-ordered notice).

**MEMORANDUM OPINION AND ORDER**                    **PAGE 66**

attempting, late in the game, to assume and assign to Baseball Express Agreement #2-the SCSA *only after it was amended* to change the term of Agreement #2-the SCSA to expire in late 2010. Rather, the only notice provided to Paradigm was in the form of the Notice of Non-Voting Status and the Confirmation Hearing Notice, which stated that TRBP was assuming (*in full*) and assigning (*in full*) Agreement #2-the SCSA.  It is an uncontested fact that Paradigm never received notice pre-confirmation of TRBP's later desire to assume and assign Agreement #2-the SCSA *only* if it was amended to change its expiration date from 2017 to 2010.  Accordingly, TRBP's purported assumption and assignment of the amended Agreement #2-the SCSA was ineffective.

The Fifth Circuit has made clear that notice to non-debtor parties to an executory contract is paramount, [233] and this court construes this to apply to Paradigm, as the third-party beneficiary of Agreement #2-the SCSA (who owed most of the performance under it), not simply to HSG, as counter-party.  The Bankruptcy Code sets forth a scheme in which a debtor-in-possession maintains almost exclusive control over the timing of its decision on assumption or rejection of an executory contract, to ensure that its decision contributes to a workable plan of reorganization, and, in turn, a non-debtor party to an executory contract is then afforded time to take steps to protect its interest after the debtor has determined the status of the contract.[234]  The Fifth Circuit stated, in *Nat'l Gypsum,* that general notice of the existence of a reorganization plan does not, by itself, provide sufficient notice of a debtor's intent to assume an executory contract as part of the plan, but, rather, the debtor has responsibility to assure that the non-debtor party to an executory contract is on notice of the debtor's specific intent to assume the contract with whatever cure amount the debtor thinks is owing.  The *Nat'l Gypsum* court stated that, absent a showing that

---

[233] *Id.*

[234] *Id.* at 505, n.5.

the non-debtor party to the executory contract possessed actual knowledge of a sufficiently refined degree, the debtor was required to demonstrate delivery of the proposed plan of reorganization, or some court-ordered notice, that set forth the debtor's intent to assume the contract with a cure amount. In *Nat'l Gypsum*, there was a fact issue as to whether the non-debtor party to the contract received pre-confirmation notice of debtor's intent to assume an executory contract with a $0 cure amount (as provided in the debtor's plan), or whether the non-debtor party was otherwise aware of debtor's intent to assume with $0 cure–thus, precluding summary judgment. But the court went on to note that ***"[i]t is extremely important that interested parties be notified and have an opportunity to appear with regard to whether or not a debtor is going to assume."*** [235] *Nat'l Gypsum* added that, if the debtor's notice to the counter-party to the executory contract of its intent to assume the executory contract with a $0 cure amount via a plan provision was inadequate, then the ultimate confirmation order could not be *res judicata* as to the cure amount and *res judicata* could not bar the counter-party's claim for arrearages under the contract.

To be sure, Paradigm (as a third-party beneficiary, same as a counter-party to the executory contract–at least in this particular context, where it was the primary performer in the three-way contractual relationship) ***was entitled to reasonable notice of what TRBP intended to do*** with regard to the Agreement #2-the SCSA, and then, also, was entitled to time to take steps to protect its interests after TRBP determined what it intended to do with the contract. Here, there was no reasonable notice to Paradigm. If Paradigm had been given reasonable notice, it could have protected its interests to some degree, such as by filing a pleading arguing that TRBP could not modify and then assume Agreement #2-the SCSA without Paradigm's consent (an

---

[235] *Id.* at 512 (citations omitted).

argument that would have been successful), and then TRBP could have been compelled to either assume or reject Agreement #2-the SCSA in its entirety. If TRBP had chosen to reject, it might have been without the Aircraft for the last couple of months of the 2010 baseball season. Paradigm might have refused to provide the Aircraft under that scenario. There might have been a question posed, in this scenario, as to TRBP's reasonable business judgment in rejecting– depending on what the economic consequences of that decision were. Paradigm might have filed a rejection damages proof of claim and lodged objections to the plan that may or may not have been successful. The point is, ***Paradigm could have exercised legal rights and taken positions in the bankruptcy court that might have been sustained***. The inadequate notice to Paradigm deprived Paradigm of its ability to take reasonable measures to protect itself.

TRBP did not follow the Bankruptcy Code protocol for correctly dealing with an executory contract.

**b.** **So What is the Consequence of TRBP Not Following Proper Bankruptcy Protocol with Regard to Agreement #2-the SCSA? How Must Agreement #2-the SCSA be Treated?**

In the July 2013 Memorandum Opinion, the court stated (on page 35 therein) that, since Agreement #3-the Amendment to the SCSA was invalid and unenforceable (in that it was entered into without the consent of the third-party beneficiary), that this left Agreement #2-the SCSA in a bit of an ambiguous status. What had happened to Agreement #2-the SCSA in the bankruptcy case? The court noted that TRBP had circumvented proper procedures under section 365 of the Bankruptcy Code, in its attempt to assume and assign it to Baseball Express ***only as amended***. But what did this mean? What was the legal consequence? Was Agreement #2-the SCSA assumed in full? Was it rejected in full? Did it "ride through" the bankruptcy case unaffected? It could not be treated as assumed and assigned in full to Baseball Express, because

of a Stipulated Judgment entered into earlier in this Adversary Proceeding.[236] The court, in

*dicta,* stated that it envisioned that the likely legal consequence was one of two alternatives: (1)

Agreement #2-the SCSA either "rode through" the bankruptcy case unaffected[237] and was

binding on TRBP because (without the amendment) it was never intended to be assumed and

assigned to any party under the chapter 11 plan; or (2) TRBP, essentially, *de facto* rejected

Agreement #2-the SCSA, by TRBP's botched, ineffective execution of Agreement #3-the

Amendment to the SCSA (the amendment—while ineffective and unenforceable—had

nevertheless contemplated termination of Agreement #2-the SCSA, just three months after

confirmation; this seemed tantamount to a rejection). Either way, Paradigm would have a breach

of contract claim. In alternative (1), the liability of TRBP would "ride through" the bankruptcy

unaffected (*i.e.,* not be discharged). In alternative (2), Paradigm would have a rejection damages

claim, under section 365(g)(1) of the Bankruptcy Code.

The court has now had the benefit of more summary judgment evidence and more

argument, briefing, and legal research. With the benefit of this additional information before it,

the court now believes that the consequences of TRBP's actions, in circumventing section 365 of

the Bankruptcy Code, are that it should be deemed bound by the only position it ever formally

took with Paradigm during the bankruptcy case, and by the only notice it ever gave Paradigm—

that is, TRBP should be bound by its notice to Paradigm that it would ***assume*** in full Agreement

#2-the SCSA. The court believes that principles of equitable estoppel require that this court treat

TRBP's actions and notices in the case as a *de facto* assumption of Agreement #2-the SCSA.

---

[236] *See* DE # 149 in the Adversary Proceeding, a stipulated judgment dismissing Baseball Express from the Adversary Proceeding and declaring that "Baseball Express has not assumed any liability for rental obligations under the Aircraft Agreements and shall have no liability to TRBP in reference to the Aircraft and the Aircraft Agreements."

[237] *Nat'l Gypsum*, 208 F.3d at 504, n.4 ("[i]f an executory contract is neither assumed nor rejected, it will 'ride through' the proceedings and be binding on the debtor even after a discharge is granted, thus allowing the non-debtor's claim to survive the bankruptcy").

For one thing, further research has suggested to this court that the "ride through" concept, with regard to executory contracts, does not apply in the situation of a ***liquidating*** debtor.[238] The Fifth Circuit has suggested that an executory contract can only "ride through" a bankruptcy case unaffected if the debtor continues operating and, in such case, the executory contract will remain a liability of the reorganized debtor.[239] Here, TRBP is not an operating, reorganized debtor. Thus, the "ride-through" concept does not seem viable after all.

Additionally, the court is troubled by the notion of treating Agreement #2-the SCSA as having been *de facto* rejected. In certain situations, this might make sense. But here, as noted earlier, the only notice provided to Paradigm was in the form of the Notice of Non-Voting Status and the Confirmation Hearing Notice early on in the case, which stated that TRBP was assuming (***in full***) and assigning (***in full***) Agreement #2-the SCSA. It is an uncontested fact that Paradigm never received anything else. As discussed earlier, Paradigm (as a third-party beneficiary, same as a counter-party to the executory contract—at least in this particular context, where it was the primary performer in the three-way contractual relationship) was entitled to reasonable notice of what TRBP intended to do with regard to the Agreement #2-the SCSA, and then also was entitled to time to take steps to protect its interests after TRBP determined what it intended to do with the contract. Here, there was no notice to Paradigm of a *de facto* rejection being contemplated. If Paradigm had been given reasonable notice of what was intended, it could have protected its interests to some degree. If TRBP had chosen to reject, on notice to Paradigm, TRBP might have been without the Aircraft for the last couple of months of the 2010 baseball season—as Paradigm might have refused to provide the Aircraft under that scenario. There might have been a question posed in this scenario as to TRBP's reasonable business judgment in

---

[238] *Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 404-405 (5th Cir. 2001) (citing authority suggesting that if there is a plan of liquidation, executory contracts ***cannot*** pass through bankruptcy unaffected).

[239] *Id.*

**MEMORANDUM OPINION AND ORDER**                                    **PAGE 71**

rejecting—depending on what the economic consequences of that decision were. Paradigm might have filed a rejection damages proof of claim and lodged objections to the plan that may or may not have been successful. The point is, Paradigm could have exercised legal rights and taken positions in the bankruptcy court that might have been sustained. ***The inadequate notice to Paradigm deprived Paradigm of its ability to take reasonable measures to protect itself***.

On balance, the only treatment of Paradigm that seems to make sense and be consistent with section 365 of the Bankruptcy Code is to treat Agreement #2-the SCSA as having been the subject of a *de facto* assumption. As alluded to earlier, the court believes that TRBP is equitably estopped from taking any different position. Equitable estoppel is a different doctrine than judicial estoppel. "The doctrine [of equitable estoppel] responds to the unfairness of parties enjoying the benefits of a contract and subsequently seeking to avoid the obligations created by that contract."[240] In general terms, equitable estoppel provides that one who retains benefits under a transaction cannot avoid his concomitant obligations under that transaction and is estopped from taking a position inconsistent with such obligations.[241] The four traditional elements of equitable estoppel are (1) the party to be estopped was aware of the facts, (2) the party to be estopped intended his act or omission to be acted upon, (3) the party asserting estoppel did not have knowledge of the facts, and (4) the party asserting estoppel reasonably relied on the conduct of the other to his substantial injury.[242]

---

[240] *Baylor Health Care Sys. v. Emp'rs. Reinsurance Corp.*, 492 F.3d 318, 325 (5th Cir. 2007).

[241] *Id.*

[242] *Taylor v. U.S. Treasury Dept.*, 127 F.3d 470, 474 (5th Cir. 1997); *see also Johnson v. Seacor Marine Corp.*, 404 F.3d 871, 878 (5th Cir. 2005) (describing the elements of equitable estoppel as a representation by conduct or word, justifiably relied upon by a party who changed his position to his detriment because of that reliance).

**MEMORANDUM OPINION AND ORDER** **PAGE 72**

The Supreme Court, in *Heckler v. Community Health Services of Crawford County, Inc.*,[243] relying on Restatement (Second) Torts, explained that, in order for equitable estoppel to apply, the party claiming the estoppel (Paradigm) must have relied on its adversary's (TRBP's) conduct in such a way as to change his (Paradigm's) position to his detriment.  Such reliance must have been reasonable, in that the party claiming the estoppel (Paradigm) did not or should not have known that its adversary's (TRBP's) conduct was misleading.[244]    There is no "intent to deceive" requirement for this type of equitable estoppel to apply.[245]

On balance, equitable estoppel seems to apply here, under the undisputed facts. The set of facts here do not really lead to the application of judicial estoppel, as articulated by Paradigm, but equitable estoppel.  The modification of the plan numerous times, after approval of the disclosure statement, to ultimately provide for the assumption and assignment (as amended) of Agreement #2-the SCSA, and to ultimately provide for the retention of causes of action, were not problematic from a judicial estoppel standpoint.  The problem was the failure to give notice to Paradigm, pursuant to Bankruptcy Code section 365 and Bankruptcy Rule 6006, as to what was happening with regard to Agreement #2-the SCSA, thus depriving Paradigm of its rights to protect itself appropriately in the bankruptcy case.  The court believes that all of the undisputed facts establish the four traditional elements of equitable estoppel: (1) TRBP was aware of the facts, (2) TRBP intended its act or omission to be acted upon, (3) Paradigm did not have knowledge of the facts, and (4) Paradigm reasonably relied on the conduct of the other to its substantial injury.  Accordingly, the court concludes that, under principles of equitable estoppel,

---

[243] *Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59 (1984).

[244] *Id.* at 59 n. 10.

[245] *Minard v. ITC Deltacom Commc'ns., Inc.*, 447 F.3d 352, 359 (5th Cir. 2006) (citing Restatement (Second) Torts § 894(1), comment b).

**MEMORANDUM OPINION AND ORDER**                    **PAGE 73**

Agreement #2-the SCSA must be treated as an assumed contract under the terms of the

Confirmed Plan, which was approved by this court via the Confirmation Order.[246]

### c. Can TRBP Bring the Counterclaim, if Agreement #2-the SCSA is Treated as an Assumed Contract? No.

Can TRBP, nonetheless, still assert the Counterclaim, even though this court has

concluded that TRBP is deemed to have **assumed** Agreement #2-the SCSA, under principles of

equitable estoppel? This court holds no.

Several courts have held that a debtor/trustee cannot bring an avoidance action against a

contract that it has assumed under section 365 of the Bankruptcy Code. Specifically, courts

have referred to this type of equitable defense under many names including "equitable estoppel,"

"promissory estoppel," or the "contract assumption defense."[247] The court will refer to these

estoppel doctrines in this context, collectively, as the contract assumption defense.

The contract assumption defense stems from *In re Superior Toy & Mfg. Co.*,[248] a case

decided by the Seventh Circuit Court of Appeals. There, the court held that a trustee could not

bring an avoidance action to recover payments made pursuant to an executory contract that was

---

[246] While judicial estoppel does not bar the Counterclaim, equitable estoppel would bar any attempt by TRBP to assert that Agreement #2-the SCSA was not assumed under the Confirmed Plan and Confirmation Order.

[247] *See e.g., Kimmelman v. Port Auth. of N.Y. & N.J. (In re Kiwi Int'l Air Lines, Inc.)*, 344 F.3d 311, 322–23 (3d Cir. 2003) (trustee's preference actions against each of the defendants was precluded, as a matter of law, by the debtor's earlier assumption of its agreements); *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1174 (7th Cir. 1996) (assumption order "divests the trustee of subsequent claims to monies paid under the contract whether they were paid prepetition or postpetition"); *E. Air Lines, Inc. v. Ins. Co. of Penn. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 999-1002 (2d Cir. 1996) (when the debtor assumes a contract, equitable estoppel principles may be applied by the court to deny the debtor permission to escape its obligation to perform the contract it assumed); *Seidle v. GATX Leasing Corp.*, 778 F.2d 659, 666 (11th Cir. 1985) (trustee precluded from bringing preference suit based on principles of equitable and promissory estoppel after court approved stipulation requiring debtor to cure all prior defaults); *Lewis Indus. v. Barham Constr., Inc.*, 878 F.2d 1230, 1231 (9th Cir. 1989) (where bankruptcy court has entered an order granting debtor's petition to assume a contract, debtor is estopped from later claiming a breach of which it knew but which it failed to raise at the assumption hearing); *Compton v. InOcean AS (In re MPF Holding U.S. LLC)*, Adv. No. 10-03454, 2013 WL 3197658, at *7-8, *14-15 (Bkrtcy. S.D. Tex. June 21, 2013) (contract assumption defense barred litigation trustee from being preference action related to previously assumed contract).

[248] *Superior Toy & Mfg. Co.*, 78 F.3d 1169.

assumed.[249] The court reasoned that permitting an avoidance action on an executory contract that had been assumed would undermine the purpose of section 365—namely, "to insure that a contracting party is made whole before a court can force the party to continue performing with a bankrupt debtor."[250] The Fifth Circuit has not yet ruled on the viability of the contract assumption defense, although at least three courts within the Circuit have recognized and applied the defense.

First, in *In re Jazzland, Inc.*, the debtor had made prepetition payments to a creditor pursuant to a licensing agreement.[251] After the debtor filed a Chapter 11 petition, the bankruptcy court granted the debtor's motion to assume the licensing agreement.[252] Thereafter, the debtor's disbursing agent brought a preference suit to recover the payments made to the creditor.[253] Citing the contract assumption defense, the court held that the debtor's assumption of the licensing agreement precluded it from bringing a preference action against the creditor.[254] The court reasoned that, "[u]nder § 365, if assumption is approved, as it was in this case, the debtor must cure all prepetition defaults under the assumed contract. The estate cannot become bound to pay amounts due under an assumed contract and also recover for the estate payments made prepetition under the contract."[255]

Similarly, in *In re MMR Holding Corp.*, the debtor sought to recover prepetition payments made pursuant to a contract that was subsequently assumed and assigned to a third

---

[249] *Id.* at 1176.

[250] *Id.* at 1174.

[251] *Noble v. ADP, Inc. (In re Jazzland, Inc.)*, Adv. No. 03–1202, 2004 WL 4945990, at *1 (Bankr. E.D. La. Dec. 16, 2004).

[252] *Id.*

[253] *Id.*

[254] *Id. at *2.*

[255] *Id.*

party.[256] The court denied the debtor's requested relief and held that prepetition payments—which might otherwise be recoverable as preferences—are not recoverable if the contract upon which the payments are based is assumed pursuant to section 365 of the Code.[257] The court articulated its reasoning as follows: "the estate cannot simultaneously become administratively obligated for all amounts due under an assumed contract (both pre- and post-petition) and recover for the estate payments made pursuant to the contract."[258]

Finally in *In re MPF Holding U.S. LLC*, the court, looking to the reasoning applied in *In re Jazzland, Inc.* and *In re MMR Holding Corp.*, held that the contract assumption defense barred a litigation trustee's preference action.[259] In *In re MPF Holding*, after first holding that the contract at issue was assumed and assigned pursuant to section 365 of the Bankruptcy Code under the debtor's confirmed plan and confirmation order (which was a substantial part of the court's analysis), the bankruptcy court (which noted that the Fifth Circuit Court of Appeals has not yet ruled on the viability of the contract assumption defense), held that the contract assumption defense applied and that the litigation trustee was barred from pursuing its preference action.[260]

While all three of the cases decided within the Fifth Circuit have applied the contract assumption defense in the context of a section 547 preference action, the court believes that the reasoning employed by these courts would also apply in the context of a fraudulent transfer action. In fact, the bankruptcy court in *In re Centrix Fin., LLC*, found that the reasoning

---

[256] *MMR Holding Corp. v. C & C Consultants (In re MMR Holding Corp.)*, 203 B.R. 605, 606–07 (Bankr. M.D. La. 1996).

[257] *Id.* at 613.

[258] *Id.*

[259] *Compton v. InOcean AS (In re MPF Holding U.S. LLS)*, Adv. No. 10-03454, 2013 WL 3197658, at *15 (Bkrtcy. S.D. Tex. June 21, 2013).

[260] *Id.* at *14-15.

**MEMORANDUM OPINION AND ORDER**                    **PAGE 76**

supporting the contract assumption defense applies with even greater force to fraudulent conveyance claims.[261] In *Centrix Fin.*, the trustee alleged that the debtor received less than reasonably equivalent value in exchange for the payments under the assumed contract.[262] In finding the contract assumption defense applied to the trustee's fraudulent transfer action, the court failed to comprehend how the Trustee could claim that the estate did not receive reasonably equivalent value for making payments under a contract that, presumably, was valuable enough to the estate to merit assumption and assignment in the first place.[263] As a result, the bankruptcy court in *Centrix Fin.* held that the contract assumption defense acted as a complete bar to not only the trustee's fraudulent transfer claim, but also the exercise of all of the trustee's avoidance powers.[264] This court agrees and finds that the contract assumption defense would bar a trustee's avoidance action, where the contract is assumed by the debtor, either under a confirmed plan or prior order of the court. This court acknowledges that the facts at bar are unusual. TRBP is being ***deemed*** to have assumed Agreement #2-the SCSA, by this court's application of equitable estoppel. But the court still finds the reasoning of the cases cited herein compelling and suitable to apply here. Here, TRBP never gave Paradigm reason to think anything other than Agreement #2-the SCSA was being assumed. Paradigm acted accordingly. Paradigm performed its obligations and sat on the sidelines of the bankruptcy case, based on assurances it received from TRBP. TRBP is equitably estopped from taking any position now other than that Agreement #2-the SCSA was assumed. Ergo, the court believes the next logical step is to apply the contract

---

[261] *Weinman v. Allison Payment Sys., LLC (In re Centrix Fin., LLC)*, 434 B.R. 880, 888 (Bankr. D. Colo. 2010).

[262] *Id.*

[263] *Id.*

[264] *Id.*; *see also Alberts v. Humana Health Plan, Inc. (In re Greater S.E. Cmty. Hosp. Corp., I)*, 327 B.R. 26, 28-32 (contract assumption defense applied to trustee's avoidance actions brought under §§ 544, 547, 548, 549, and 550; a trustee's assumption power and his avoidance powers are mutually exclusive avenues).

**MEMORANDUM OPINION AND ORDER** **PAGE 77**

assumption defense and, thereby, bar the Counterclaim, applying this doctrine, as a matter of law.

## VI.    CONCLUSION

For the reasons articulated above, the court is granting Paradigm's Second Motion for Summary Judgment.  A separate Summary Judgment Dismissing the Counterclaim shall be entered forthwith.

**IT IS SO ORDERED.**

**###END OF MEMORANDUM OPINION AND ORDER###**

## APPENDIX A



*Held FAA Operating Certificate
** Owned the Aircraft at all relevant times
***Lessee of the Aircraft